COMMONWEALTH *VS.* STEPHEN PARZICK.

No. 04-P-1738.

Berkshire. June 10, 2005. - October 26, 2005.

Present: LAURENCE, DUFFLY, & KATZMANN, JJ.

*Firearms. License. Statute,* Construction.

At the trial of an indictment charging the defendant with improper storage of
a firearm, in violation of G. L. c. 140, § 131L, the evidence was sufficient
to permit the jury to find guilt, where guns stored in an unlocked bedroom
closet within a locked bedroom were not "secured in a locked container"
as required by the statute, in that the bedroom door lock was easily defeated
by anyone with a bobby pin and did not prevent ready access by anyone
other than the lawful owner of the guns. [848-851]

The evidence at the trial of an indictment charging the defendant with posses-
sion of a firearm without a valid firearm identification (FID) card, in viola-
tion of G. L. c. 269, § 10(*h*), was sufficient to permit the jury to find guilt,
where there was no basis in the statute for the defendant's claim that he
reasonably relied on his receipt for the application fee as a substitute for an
FID card in the absence of written notice from the licensing authority
notifying him of the denial of his license renewal application, and where
the Commonwealth was not required to prove the denial of the defendant's
application as an essential element of the crime. [851-853]

INDICTMENTS found and returned in the Superior Court Depart-
ment on November 16, 2001.

The cases were tried before *Daniel A. Ford,* J.

*Lisa J. Steele* for the defendant.

*Joseph A. Pieropan,* Assistant District Attorney, for the
Commonwealth.

DUFFLY, J. A jury found the defendant, Stephen Parzick, guilty
of improper storage of a firearm in violation of G. L. c. 140,
§ 131L, and possession of a firearm without a valid firearm
identification (FID) card, in violation of G. L. c. 269, § 10(*h*).
In his appeal, the defendant contends that guns stored in an
unlocked bedroom closet within a locked bedroom are "secured

in a locked container," as required by G. L. c. 140, § 131L. He also claims that (1) the licensing authority's failure to notify him of the denial of his license renewal application entitled him to assume that his expired license remained valid; (2) G. L. c. 140, § 129B(12), does not provide an affirmative defense, but rather puts the burden on the Commonwealth to prove that his expired license was not valid; and (3) the trial judge erred in failing to give a requested instruction that the law requires an applicant for an FID card to be notified in writing of the denial of his application. We affirm.

*Summary of facts and proceedings.* At trial, the defendant filed motions for required findings of not guilty both at the close of the Commonwealth's case and at the close of all of the evidence. In our review of the denial of his motions for required findings of not guilty, we determine whether the evidence, viewed "together with permissible inferences from that evidence [and] in the light most favorable to the Commonwealth," was sufficient to satisfy the jury that all of the essential elements of the crime existed beyond a reasonable doubt. *Commonwealth* v. *Platt*, 440 Mass. 396, 400 (2003). "The relevant question is whether the evidence would permit a jury to find guilt, not whether the evidence requires such a finding." *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 (1992), quoting from *Commonwealth* v. *Brown*, 401 Mass. 745, 747 (1988).

The defendant was friends with Debra Mayernik and her husband, both of whom worked for him in exchange for lodging in his home. Mayernik's son, seventeen year old Stephen Fish, also came to live in the house. The defendant did not permit Fish, who had his own bedroom, to be alone in the house or to have access to any bedroom other than his own. The defendant was home on August 19, 2001, when he discovered that several rifles he owned (as well as other items of value) were missing from his bedroom closet where he stored them, leaning against the wall in the corner behind his clothes. The closet was not equipped with a lock. When he was not at home, the defendant barricaded the closet door with boxes and other items and locked his bedroom door. That door was fitted with a knob lock that could be locked from inside the room. Mayernik had an identical lock on her bedroom door, which she opened from the outside by inserting a bobby pin into the hole in the knob.

The defendant told Fish's mother of the theft, and she immediately called the police. One of the responding officers accompanied the defendant into his bedroom to determine how many guns were stolen. Upon observing where the guns were kept, the officer informed the defendant that his firearms were improperly stored as they did not have trigger locks and were not stored in a "gun-securing cabinet" or in a properly secured room. Fish returned home during the investigation and admitted to the theft of the guns.

Asked by the officers whether he had an FID card, the defendant said he did, but had not picked it up from the police station. Because his FID card had expired, the defendant had applied for a new card on January 5, 2000, some nineteen months before the date he discovered that his guns were stolen. He had received a canceled check for his application fee. There was testimony from the officer in charge of processing firearms license applications that the defendant's application had been denied at some point, but written notice of the denial had not been sent to the defendant. There was no evidence of the date of the denial, but as of August 19, 2001, the date of the offense, the defendant had not received notice of denial and had not inquired about the status of his application.

*Discussion.* 1. *Improper storage of a firearm.* The defendant argues that his bedroom was a container within the meaning of G. L. c. 140, § 131L, and that he was not in violation of the statute because the bedroom door was locked. The defendant's interpretation of the statute ignores the requirement that a container must not only be "locked" but also "secure." Section 131L, inserted by St. 1998, c. 180, § 47, provides in relevant part as follows:

> "(*a*) It shall be unlawful to store or keep any firearm . . . in any place unless such weapon is *secured in a locked container* or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner . . ." (emphasis added).[1]

The phrase "secured in a locked container" is not defined by

---

[1] None of the defendant's guns was so equipped.

the statute.[2] "When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose." *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977). The Legislature's intent may be ascertained "from all [the statute's] words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." *Commonwealth* v. *Connor C.*, 432 Mass. 635, 640 (2000), quoting from *Champagne* v. *Champagne*, 429 Mass. 324, 326 (1999).

Read in its entirety, the statutory scheme governing gun control evinces a legislative purpose "to prevent the temptation and the ability to use firearms to inflict harm, be it negligently or intentionally, on another or on oneself." *Commonwealth* v. *Lee*, 10 Mass. App. Ct. 518, 523 (1980). As we have had occasion to observe, "[t]he goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons" and the Legislature has adopted a wide range of methods "to accomplish this goal, including . . . the imposition of serious penalties for infractions of the firearms control laws." *Ruggiero* v. *Police Commr. of Boston*, 18 Mass. App. Ct. 256, 258 (1984). We note as well that G. L. c. 140, § 123, inserted by St. 1998, c. 180, § 19, requires firearms dealers to give written warning to gun purchasers and to "conspicuously post at each purchase counter . . . in bold type not less than one inch in height [the following]: 'IT IS UNLAWFUL TO STORE OR KEEP A FIREARM, RIFLE, SHOTGUN OR MACHINE GUN IN ANY PLACE UNLESS THAT WEAPON IS EQUIPPED WITH A TAMPER-RESISTANT SAFETY DEVICE OR IS STORED OR KEPT IN A *SECURELY LOCKED CONTAINER*' " (emphasis added).

---

[2]Although our courts have not interpreted the phrase "secured in a locked container," we have said that the "usual and natural meaning" of "a container is 'a receptacle (as a box or jar) or a formed or flexible covering for the packing or shipment of articles, goods or commodities' . . . ; and a receptacle is 'one that receives and contains something.' " *Commonwealth* v. *Lee*, 10 Mass. App. Ct. 518, 523 n.3 (1980), quoting from Webster's Third New Intl. Dictionary 491, 1894 (1971). We assume, without deciding, that a bedroom may constitute a container for purposes of the statute.

The use of the word "secured" in G. L. c. 140, § 131L, comports with its use in G. L. c. 140, § 123, and indicates that the container must not merely be locked, but securely locked. See *Commonwealth* v. *Lee*, 10 Mass. App. Ct. at 522, quoting from *Libby* v. *New York, N.H. & H.R.R.*, 273 Mass. 522, 525-526 (1930) (statute is to be interpreted so that "no clause, sentence or word shall prove superfluous, void or insignificant if by any other construction it may be made useful and pertinent"). The Connecticut Supreme Court, in *State* v. *Wilchinski*, 242 Conn. 211 (1997), interpreting a similar statute,[3] defined the word "secure" to mean "to 'hold fast,' to 'tie down,' to 'put beyond hazard of losing,' or 'inviolable,' " as well as "to relieve from exposure to danger." *Id.* at 224-225, quoting from Webster's Third New Intl. Dictionary 2053 (1963). That court concluded that the only logical definition of "secure" in the context of the statute was "one that focuses both on preventing minors from gaining access to guns and on preventing them from being able to misuse the weapon." *Id.* at 225.

We likewise conclude that G. L. c. 140, § 131L, requires guns to be maintained in locked containers in a way that will deter all but the most persistent from gaining access. Even a door locked with a key is not secure if the key is hanging next to the lock. Assuming the defendant's bedroom to be a container, and further that it was locked at the time of the theft,[4] the defendant was in violation of G. L. c. 140, § 131L, because the lock was easily defeated by anyone with access to a bobby pin and did not prevent ready access by anyone other than the lawful owner. Because the evidence supports a finding that the

[3]Connecticut Gen. Stat. § 29-37i (2003) provides in pertinent part as follows: "No person shall store or keep any loaded firearm on any premises under his control if he knows or reasonably should know that a minor is likely to gain access to the firearm . . . unless such person (1) keeps the firearm in a securely locked box or other container or in a location which a reasonable person would believe to be secure . . . ."

[4]We think the jury might have inferred from the evidence that the defendant, who testified that he locked the bedroom door when he was not at home, was at home when Fish took the guns. The defendant also testified that he had informed his insurance company that he did not see any sign of forced entry and that he assumed that Fish had simply walked into the bedroom to steal the guns. The conviction might have been upheld on the ground that the room was not locked. Because it was not argued, we do not base our decision on this view of the facts.

room was not a securely locked container, denial of the defendant's motions for a required finding of not guilty was proper.

2. *Invalid FID card.* "[A] qualified individual may lawfully possess a firearm" if he has obtained an FID card or is exempt from this requirement. *Commonwealth* v. *Morse*, 12 Mass. App. Ct. 426, 428 (1981). Under the law of the Commonwealth, the "[a]bsence of a license is not an 'element of the crime' " of possessing or carrying a firearm in violation of G. L. c. 269, § 10(*h*). *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977). See *Commonwealth* v. *Farley, post* 854, 860-862 (2005). See also G. L. c. 278, § 7 ("A defendant in a criminal prosecution, relying for his justification upon a license . . . or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized"). The burden is thus on a defendant to come forward with evidence that he possesses a valid license. Until he does, the presumption remains in effect that he was not licensed and "no issue is presented with respect to licensing." *Commonwealth* v. *Jones, supra.*

We reject the defendant's contention that it was the Commonwealth's burden, pursuant to G. L. c. 140, § 129B(12), "to disprove [the defendant's] entitlement to an FID card at the time of the incident." General Laws c. 140, § 129B(12), inserted by St. 1998, c. 180, § 29, as in effect on the date of the offense, provides, in pertinent part:

> "Notwithstanding the provisions of section 10 of chapter 269, any person in possession of a non-large capacity rifle or shotgun whose firearm identification card issued under this section is invalid for the sole reason that it has expired, but who shall not be disqualified from renewal upon application therefor under this section, shall be subject to a civil fine . . . and the provisions of said section 10 of said chapter 269 shall not apply . . . ."

This statute does not alter the Commonwealth's burden or change the elements of the crime of which the defendant was charged. See *Commonwealth* v. *Jones*, 372 Mass. at 406. Rather § 129B(12) provides an affirmative defense to the criminal charge of possession of a firearm without a valid FID card; as

such, it is only when a defendant has produced evidence sufficient to raise the affirmative defense that it becomes the "Commonwealth's burden to establish beyond a reasonable doubt that the defense was unavailable to the defendant." *Commonwealth* v. *Farley, supra* at 862 (construing similar language in G. L. c. 140, § 131[*m*]). The defendant makes no claim that he produced evidence sufficient to raise the affirmative defense.

The defendant further argues that he reasonably relied on a canceled check to act as a substitute for an FID card in the absence of written notice that his license had been denied.[5] He asserts that the canceled check was a "receipt" for payment of the application fee. Passing the question whether a canceled check may constitute the type of receipt contemplated by the statute — which does not define the term,[6] but does require that "[u]pon revocation or suspension [of an FID card], the licensing authority shall take possession of such card and receipt for fee paid for such card," G. L. c. 140, § 129B(4) — we think such reliance is misplaced. The defendant had been denied renewal, though he was not so informed, and being "disqualified" is the only basis upon which an application for renewal may be denied under G. L. c. 140, § 129B(1). Therefore, the defendant was not entitled to a renewed FID card and no receipt for fee paid could serve as a valid substitute for the FID card in these circumstances. G. L. c. 140, § 129B(12).

We also reject the defendant's claim that evidence to convict was lacking because the failure to give him notice of the denial of his application[7] established that he did not have the "mens rea" required for the offense under G. L. c. 269, § 10(*h*). The denial of his application was not an essential element of the

---

[5]General Laws c. 140, § 129B(12), as in effect at the time of the offense, provides in relevant part: "Pending the issuance of a renewed firearm identification card, a receipt for the fee paid, after five days following issuance, shall serve as a valid substitute . . . unless the applicant is disqualified."

[6]Compare G. L. c. 140, § 129B(7), as in effect prior to St. 2004, c. 150, § 4 (prescribing that FID card be "in a standard form provided by the executive director of the criminal history systems board and shall contain an identification number, name, address, photograph, fingerprint, place and date of birth, height, weight, hair color, eye color and signature of the cardholder," among other things).

[7]General Laws c. 140, § 129B(3), as in effect at the time of the offense, provides in relevant part:

crime that the Commonwealth was required to prove. *Commonwealth* v. *Hampton*, 26 Mass. App. Ct. 938, 940 (1988) ("[T]here is nothing in the statute or case law that states that knowledge of the suspension of the license to carry firearms is an essential element of the crime to be proved by the Commonwealth"). See *McQuoid* v. *Smith*, 556 F.2d 595, 598 (1st Cir. 1977) ("To convict under section 10[*h*], it need not be shown that the accused knew of the necessity of a license [or] that he possessed criminal scienter . . ." [emphasis omitted]).[8]

*Judgments affirmed.*

---

"The licensing authority . . . shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing . . . ."

The defendant was, however, entitled to obtain judicial review under G. L. c. 140, § 129B(5), "within 90 days after the expiration of the time limit in which the licensing authority is required to respond to the applicant," if he did not receive notice as required by G. L. c. 140, § 129B(3).

[8]Because we conclude that the defendant's lack of knowledge that his application had been denied does not constitute a defense to the charge of possession of a firearm without a valid FID card in violation of G. L. c. 269, § 10(*h*), we also reject his claim that the trial judge improperly refused to give a requested jury instruction that it is the licensing authority's obligation, under G. L. c. 140, § 129B(3), to notify applicants in writing of the denial of their application for an FID card.