JOANNE D. JUPIN, administratrix,[1] & another[2] vs. SHARON
KASK.

Worcester. February 9, 2006. - June 30, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Negligence,* Duty to prevent harm. *Public Policy. Firearms. Strict Liability.
Nuisance.*

The judge in a civil action erred in granting summary judgment in favor of
   the defendant homeowner on a claim that she was negligent in failing
   properly to secure a handgun stored on her property, which handgun was
   used in the shooting of the plaintiff's decedent, where the defendant owed
   a duty of reasonable care to the decedent [146-148], in that the risk that a
   person known by the defendant to have a history of violence and mental
   instability, to whom she gave unsupervised access to her property, would
   take a gun from there and use it to shoot someone, was both foreseeable
   and foreseen [148-150]; further, public policy favored imposition of a duty
   on the person in control of property to exercise due care with regard to the
   storage of guns on the premises, given that firearms are dangerous
   instrumentalities, the costs of imposing such a duty are modest, and
   recognizing such a duty would not expose a property owner to endless li-
   ability and litigation [150-156].
The judge in a civil action properly granted summary judgment in favor of the
   defendant homeowner on a claim that she should be held strictly liable for
   the harm caused by a gun stored in her home, where such storage was
   neither ultrahazardous nor extraordinary [156-158]; likewise, the judge
   properly granted summary judgment in favor of the defendant on a claim
   that her failure properly to secure the guns stored in her basement
   constituted a public nuisance, where unloaded firearms did not inherently
   interfere with or threaten the public safety [158-159].

CIVIL ACTION commenced in the Superior Court Department on
May 6, 2002.

The case was heard by *Francis R. Fecteau,* J., on a motion
for summary judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

[1]Of the estate of Lawrence M. Jupin.

[2]Town of Westminster. The town did not file an appearance or a brief in
this court.

*Douglas L. Fox* for Joanne D. Jupin.

*June A. Harris* for the defendant.

*Dennis A. Henigan, Elizabeth S. Haile & Daniel R. Vice* of the District of Columbia, *Daniel C. Swanson & Clifford J. Zatz,* for The Brady Center to Prevent Gun Violence & others, amici curiae, submitted a brief.

CORDY, J. On May 10, 1999, Jason Rivers (Jason), a young adult with a history of violence and mental instability, shot and fatally wounded Officer Lawrence Jupin of the Westminster police department during a foot chase. Jason had obtained the handgun with which he killed Officer Jupin from the home of Sharon Kask (Kask), where his father, Willis Rivers (Rivers), and Kask resided. Kask owned the home. Rivers owned a sizeable gun collection, which he stored in the basement. Jason had been given a key to the home (by Kask or with her knowledge) and was permitted full access to the property, regardless of the presence or absence of Kask or Rivers. Jason had not been given permission to take a gun from the collection.

Joanne Jupin (Jupin), on behalf of her son Lawrence, brought a civil action against Kask, claiming that (1) she was negligent in failing properly to secure the handgun used in the shooting and that she should be liable for the harm caused by it; (2) even if not negligent, Kask should be held strictly liable for the harm caused by a gun stored in her home; and (3) Kask's failure to properly secure the guns stored in her basement constituted a public nuisance. A Superior Court judge granted summary judgment in favor of Kask on all claims, concluding that she owed no duty of care to Officer Jupin in the circumstances of the case, and that the law did not support extending theories of strict liability or public nuisance to the storing of lawfully obtained, unloaded firearms in one's home. The plaintiff appealed, and we transferred the case to this court on our own motion.

We affirm summary judgment on the claims of strict liability and public nuisance. The storage of lawfully obtained, unloaded weapons on one's property is not an ultrahazardous activity of the type to which we would apply a theory of strict liability. Nor does such storage (at least on the facts presented here) cre-

ate a public nuisance. Consequently, if the case can proceed at all, it must proceed on the claim that Kask was negligent in ensuring the proper storage of firearms kept on her property. The survival of that claim, in turn, depends on whether Kask had a duty of reasonable care.

"Whether there is a duty to be careful is a question of law," *Andrade* v. *Baptiste*, 411 Mass. 560, 565 (1992), which we determine "by reference to existing social values and customs and appropriate social policy." *Cremins* v. *Clancy*, 415 Mass. 289, 292 (1993). In the circumstances of this case, we conclude that a homeowner who permits guns to be stored on her property and allows unsupervised access to that property by a person known by her to have a history of violence and mental instability, has a duty of reasonable care to ensure that the guns are properly secured. This duty is owed to, inter alia, a law enforcement officer shot by the person granted unsupervised access, because the officer is a foreseeable victim of the alleged improper firearm storage. We therefore reverse summary judgment on the negligence claim and leave to a jury the determination whether Kask exercised reasonable care.[3]

1. *Background.* We recount the facts in the summary judgment materials in their light most favorable to the plaintiff, drawing all permissible inferences in her favor. *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 (1983). In 1983, Kask became the sole owner of a single-family home located at 29 Otis Street, Fitchburg. In the same year, Kask's boy friend, Rivers, moved in with her. Rivers was a hunter and had a collection of approximately thirty firearms. He had a license for and was the owner of each of these guns. Kask assented to Rivers's storing the weapons in her basement in a gun cabinet he would eventually build. Rivers constructed the gun cabinet from particle board. It was secured with a padlock and hasp. The hasp had exposed screws, apparently observable by anyone who inspected the cabinet, which allowed someone without a key to the lock to remove the hasp and thereby gain access to the guns.

---

[3] We acknowledge the amici curiae brief filed on behalf of the Brady Center to Prevent Gun Violence, International Brotherhood of Police Officers, Massachusetts Million Mom March, and Stop Handgun Violence.

Kask testified in her deposition that she was, on occasion, in the basement during the construction of the gun cabinet, and that in the sixteen years between the construction of the cabinet and the incident at issue here, she had seen the finished gun cabinet and the weapons locked inside it. Kask also testified that the gun cabinet was the only method used to secure the guns in her home[4] and that firearms were a danger to the public if stolen. She acknowledged that "a stolen firearm was a dangerous thing to be in the hands of the wrong person" and that "there would be a corresponding responsibility on those who stored firearms to be sure that they were kept in a way that they would not be at risk of being stolen." She assumed that Rivers "wouldn't store something like that — unless it could be under lock and key in a cabinet." Nevertheless, it is clear from the record that Kask took no responsibility for, or other control over, the construction, maintenance, or security of the gun cabinet. Her testimony reveals that she never handled the guns or accompanied Rivers on hunting or target shooting outings and that she wanted as little as possible to do with the guns and the gun cabinet.[5]

Rivers's adult son, Jason, lived in the Kask home at various times between 1983 and 1999. Although he was not living at the Kask home at the time of the shooting, Kask testified that Jason had a key to the house and would, apparently often, come to the house regardless of whether she or Rivers was home.

---

[4]Kask's home was not equipped with a burglar alarm and there was no evidence that the door from the inside of her house to the basement had any locking device.

[5]Initially, Kask did not even seem to know what weapons Rivers had brought into the house:

PLAINTIFF'S COUNSEL: "What guns or firearms did you see him bring with him at that time?"

THE DEFENDANT: "I never saw any."

PLAINTIFF'S COUNSEL: "Was that because you weren't at home when he brought them in?"

THE DEFENDANT: "Because I didn't care, and I didn't look, and he had a cabinet built, and he put them in the cabinet."

Additionally, although Kask knew that there was a key to the cabinet hidden in the basement, she told Rivers that she did not want to know where the key was located. She did not know whether there was more than one key to the cabinet.

Jason had a history of violence and mental instability, of which Kask was aware, at least in part. Kask knew that (1) Jason had been arrested for assaulting a college professor and that this had led to his psychiatric institutionalization for a ten-day observation period as well as subsequent counselling; (2) Jason had been arrested for assaulting a former girl friend and that this had led to a prison sentence; (3) Jason was involved in a third altercation, which required him to report to court for a hearing on a possible probation violation in May, 1999; and (4) Jason had gone absent without leave from the United States Army, and was subsequently discharged. In addition, Kask was aware that Jason had experience with weapons (from his service in the Army), had expressed interest in obtaining a firearms license, and had often been to the Kask basement, where his father's collection was stored.

Jason did not appear for his May, 1999, probation violation hearing, and a warrant issued for his arrest. On the night of May 10, 1999, Officer Jupin and his partner saw Jason (whom they did not know), dressed in military camouflage, walking on a dark and isolated country road. After a pat-down search revealed a hunting knife, the officers ran a warrant check. Before the check was complete, Jason fled. During the ensuing foot chase, Jason shot Officer Jupin three times. In returning fire, Officer Jupin shot and wounded Jason, who was then arrested. A .357 magnum handgun was recovered from the scene.

The investigation led the police to the Kask residence the morning after the shooting. According to Kask, "they wanted to know if we had any [guns] and if any were missing." Although Rivers initially checked the gun cabinet and reported no guns missing, a second inspection by him revealed that a .357 magnum handgun was in fact missing and that the gun recovered from the shooting was the gun removed from his collection. Rivers then showed Kask that the screws in the gun cabinet's hasp were incorrectly positioned, and realized that someone had circumvented the lock by unscrewing the screws and removing the hasp, later replacing the screws to cover up the theft.

2. *Standard of review.* Summary judgment is to be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). Disputed

facts are material only if they have a bearing on the outcome of the case. *Norwood* v. *Adams-Russell Co.*, 401 Mass. 677, 683 (1988). The moving party may prevail by showing that the non-moving party has no reasonable expectation of proving an essential element of his case at trial. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 710 (1991). We review the motion judge's decision in light of this standard.

3. *Negligence claim.* a. *Duty of care, generally.* To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage. See J.R. Nolan & L.J. Sartorio, Tort Law § 11.1 (3d ed. 2005). We generally consider the latter three questions — whether a defendant exercised reasonable care, the extent of the damage caused, and whether the defendant's breach and the damage were causally related — to be the special province of the jury. See *Mullins* v. *Pine Manor College*, 389 Mass. 47, 57-58 (1983) (*Pine Manor*). However, the existence of a duty is a question of law, and is thus an appropriate subject of summary judgment. See, e.g., *Remy* v. *MacDonald*, 440 Mass. 675, 677 (2004) ("If no such duty exists, a claim of negligence cannot be brought").

"The concept of 'duty' . . . 'is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.' " *Luoni* v. *Berube*, 431 Mass. 729, 735 (2000), quoting W.L. Prosser & W.P. Keeton, Torts § 53, at 358-359 (5th ed. 1984). "The assertion that liability must . . . be denied because defendant bears no duty to plaintiff 'begs the essential question — whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.' " *Tarasoff* v. *Regents of the Univ. of Cal.*, 17 Cal. 3d 425, 434 (1976), quoting *Dillon* v. *Legg*, 68 Cal. 2d 728, 734 (1968). "[A] duty finds its 'source in existing social values and customs,' " see *Pine Manor*, *supra* at 51, quoting *Schofield* v. *Merrill*, 386 Mass. 244, 247 (1982), and

thus "imposition of a duty generally responds to changed social conditions." *Petolicchio* v. *Santa Cruz County Fair & Rodeo Ass'n*, 177 Ariz. 256, 262 (1994).

We have recognized that "[a]s a general principle of tort law, every actor[6] has a duty to exercise reasonable care to avoid physical harm to others." See *Remy* v. *MacDonald*, *supra* at 677, citing Restatement (Second) Torts § 302 comment a (1965). A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. See *Foley* v. *Boston Hous. Auth.*, 407 Mass. 640, 646 (1990), quoting *Husband* v. *Dubose*, 26 Mass. App. Ct. 667, 669 (1988) ("There is no duty owed when the risk which results in the plaintiff's injury is not one which could be reasonably anticipated by the defendant"). See also *Husband* v. *Dubose*, *supra* (determination whether person has duty to protect another from harm caused by third party "involve[s], to some extent, the foreseeability of the harm"). Consequently, with some important exceptions, "a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." *Tarasoff* v. *Regents of the Univ. of Cal.*, *supra* at 434-435. See Restatement (Second) Torts § 284 (1965) ("Negligent conduct may be . . . an act which the actor as a reasonable man should *recognize* as involving an unreasonable risk of causing an invasion of an interest of another . . . ." [emphasis added]). "To the extent that a legal standard does exist for determining the existence of a tort duty . . . it is a test of the 'reasonable foreseeability' of the harm." McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1230 (2000) (McClurg). In the instant case, Jupin argues that the theft of the handgun by Jason, and its subsequent use in the killing of a police officer, was a foreseeable consequence of Kask's not ensuring the proper storage of firearms kept on her property,[7] and that Kask thus owed the officer a duty of reasonable care. We agree that there

---

[6]"The word 'actor' is used in the Restatement . . . to describe the person whose conduct is in question as a basis for liability. . . . It includes, therefore, one whose conduct consists of failure to act as well as one who does act." Restatement (Second) Torts § 314 comment b (1965).

[7]We acknowledge Jupin's argument that such a question is a factual inquiry better suited for the jury. We note, however, that insofar as foreseeability

was a duty of reasonable care in this case and find no public policy justification for refusing to impose it.

b. *Foreseeability.* Although there is a "general proposition that there is no duty to protect others from the criminal or wrongful activities of third persons," see *Pine Manor, supra* at 50, there are exceptions to this proposition and many situations to which it does not apply. See, e.g., *id.* ("We conclude that this rule has little application to the circumstances of this case"); *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326-328 (1982) (tavern keeper owes duty toward all drivers not to serve alcohol to intoxicated patron even though vehicle accident caused by patron's criminal act of driving while intoxicated). The Restatement of Torts (Second) explains that "[a]n act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm . . . ." Restatement (Second) of Torts § 302B (1965). This is true "even though such conduct is criminal." *Id.* See McClurg, *supra* at 1231, quoting Restatement (Second) of Torts § 302B comment e (1965) (reasonable person required to anticipate and guard against criminal misconduct "where the actor's own affirmative act has created or exposed the [victim] to a recognizable high degree of harm through such misconduct, which a reasonable man would take into account"). Another section of the Restatement makes clear that a third party's criminal conduct is not unforeseeable if "the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a . . . crime." Restatement (Second) of Torts § 448 (1965).

We previously discussed the foreseeability of a third party's criminal acts in *Pine Manor, supra* at 55. That case involved a college student who was raped on her campus by a person who was not part of the college community. *Id.* at 47, 55. The col-

bears on the existence of a duty, it is not appropriate to leave such an issue to the jury. See, e.g, *Mullins* v. *Pine Manor College*, 389 Mass. 47, 55 (1983) (analyzing foreseeability as part of determination whether duty of care existed). Confusion here is not surprising, as the issue of foreseeability insofar as it affects the causal relationship between the defendant's breach of a duty and the victim's injuries is for the jury to decide.

lege argued that it had no duty to protect the student from the criminal act of a third party because, inter alia, "the criminal attack here was not foreseeable." *Id.* at 54. We rejected this argument for two reasons. First, we concluded it was untenable because of the testimony of a university official who admitted that he had foreseen the risk that a student at Pine Manor could be attacked and raped. Second, we noted that the director of student affairs had "warned students during freshman orientation of the dangers inherent in being housed at a women's college near a metropolitan area," and concluded that "the precautions [this college] and other colleges take to protect their students against criminal acts of third parties would make little sense unless criminal acts were foreseeable." *Id.* Thus, we determined that "[t]he risk of such a criminal act was not only foreseeable but was actually foreseen." *Id.*

As in *Pine Manor*, the risk in the instant case — that a mentally unstable and violent person, to whom unfettered and unsupervised access to Kask's home was granted, would take a gun from that home and shoot someone — was both foreseeable and foreseen. Kask's deposition testimony makes clear that she foresaw the danger of improperly securing the firearms. She conceded that because "a stolen firearm was a dangerous thing to be in the hands of the wrong person," "there would be a corresponding responsibility on those who stored firearms to be sure that they were kept in a way that they would not be at risk of being stolen." She also quite markedly implied that it would be unreasonable to "store something like [a gun] — unless it could be under lock and key in a cabinet." Her testimony leaves the unmistakable impression that she foresaw the risk of a gun's being stolen and subsequently used in a criminal act, if it was improperly stored.

At the very least, Kask should have foreseen that Jason — whom she knew had a history of violence, had recent problems with the law, and had been under psychiatric observation — might use his unsupervised access to the house to take a weapon from the basement gun cabinet, and subsequently use this weapon in the commission of a violent crime.[8] In a case very similar to this, *Estate of Heck* v. *Stoffer*, 786 N.E.2d 265, 269

---

[8]It is irrelevant whether Kask foresaw or should have foreseen the *specific*

(Ind. 2003), the Supreme Court of Indiana found that two parents owed to a police officer, shot by their adult son, a duty of properly securing firearms stored in their house. In that decision, the son, who had a criminal history and was mentally unstable, no longer lived with his parents, but retained, with their permission, a key to the house. Concluding that its foreseeability analysis "weighs in favor of the establishment of a duty," the court considered "most important" the fact that the son "retained free and unfettered access to his parents' home." *Id.* The court added that the parents "failed to safeguard the gun from a mentally disturbed, habitual and violent offender with free access to the premises." *Id.* Cf. McClurg, *supra* at 1234 (while "[e]xisting case law [from other jurisdictions] on liability for the criminal misuse of stolen guns is split[,] . . . almost all of [the cases that have approved liability] involve situations where the assailant who 'stole' the gun was a member of the household where the gun was stored"). We can discern no meaningful distinction — certainly not one regarding the foreseeability of Kask's conduct — between the *Estate of Heck* decision and the case before us, and agree with that court's analysis.[9]

   c. *Public policy.* That the harm in this case was reasonably foreseeable or even actually foreseen is persuasive, but not conclusive, of the existence of a duty of care. "There are a limited number of situations . . . in which the other legal

---

danger that occurred — i.e., that Jason would shoot a police officer during a foot chase. See McClurg, Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1232 (2000) (McClurg) ("Reasonable foreseeability under tort law does not require the precise sequence of events or manner of injury foreseeable. It is sufficient that the same general kind of harm was a foreseeable consequence of the defendant's risk-creating conduct. . . . [S]everal courts have specifically recognized that gun thefts and subsequent misuse are foreseeable consequences of negligent storage"). See also *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. 450, 454 (1969) ("specific kind of harm need not be foreseeable as long as it was foreseeable that there would be . . . violence towards others").

   [9]We need not and do not decide in this case whether the theft and subsequent criminal use of an improperly stored gun by a person not permitted free access to the home by the owner is objectively foreseeable. Nor do we decide whether sound public policy would countenance imposition of a duty on a homeowner for the same. But see McClurg, *supra* at 1236 ("Only a handful of courts have addressed this issue . . . . The results are split, although the 'no liability' cases outnumber the 'pro liability' cases").

requirements of negligence may be satisfied, but the imposition of a precautionary duty is deemed to be either inadvisable or unworkable." *Remy* v. *MacDonald*, 440 Mass. 675, 677 (2004). We conclude, however, that sound public policy favors imposition of a duty in these circumstances.

A firearm is a dangerous instrumentality. See *Sojka* v. *Dlugosz*, 293 Mass. 419, 423 (1936) (rifle is "highly dangerous instrumentality"). It is beyond question that a heightened amount of care is required of persons dealing with dangerous instrumentalities. See *Bennet* v. *Marquis*, 325 Mass. 375, 376 (1950) (defendant's shooting hunting rifle was "handling a dangerous weapon, and . . . was bound to use the degree of care commensurate with the serious harm that might follow from the lack of such care"); Restatement (Second) Torts § 298 comment b (1965) ("those who deal with firearms, explosives, poisonous drugs, or high tension electricity are required to exercise the closest attention and the most careful precautions"). A commonsense corollary to this proposition is that a person with even limited responsibility for or control over a dangerous instrumentality, like a firearm, may, have a duty to exercise care in a situation where no such duty would exist if the instrumentality was not considered highly dangerous. Cf. Restatement (Second) of Torts, *supra* at § 318 comment c ("If one in possession of land permits a third person to conduct an activity on it which is highly dangerous unless great care is taken, he may properly be required to exercise constant vigilance to be able to exercise his control . . . when and if the occasion for it arises").

In this case, Kask chose to allow a large collection of dangerous instrumentalities (firearms) to remain on her property, and permitted unsupervised access to the same property to a person whom she knew had a history of violence and mental instability. The risk and seriousness of injury that might result from such a person taking a firearm, and thus the costs associated with not recognizing a duty in these circumstances, are high. Accord *Irons* v. *Cole*, 46 Conn. Supp. 1, 6 (1998) ("Deaths and injuries resulting from use of improperly stored and safeguarded guns are a mounting societal problem."); *Volpe* v. *Gallagher*, 821 A.2d 699, 717 (R.I. 2003) ("possessors of residential property would have carte blanche to allow third-party users of their

property . . . to engage in such inherently dangerous activities as possessing guns . . . on the possessors' property, and thereby needlessly exposing their neighbors and other innocent parties to wrack and ruin, let alone bodily injury and death").

On the other hand, the costs of imposing the duty sought here — both the financial costs of ensuring the proper securing of firearms and the more esoteric costs involved with requiring certain actions to relieve potential liability — are modest. In the present case, Kask's burden was not a financial one. She simply was required to take reasonable care to ensure that the guns stored on her property were either secured and not accessible to Jason, or were removed. Indeed, a jury might well find that Kask adequately performed her duty of care by ensuring that Rivers built a locked gun cabinet in which to store the guns.

This is not a case in which recognizing a duty would expose a property owner to endless liability and litigation from or for the acts of innumerable persons who briefly entered the owner's premises. Contrast *Luoni* v. *Berube*, 431 Mass. 729, 734 (2000) (concluding host had no duty to third person injured by party guest's use of fireworks that he brought onto owner's land without her knowledge because such duty would lead to "considerable litigation, with plaintiffs claiming that social hosts should have supervised guests who misused alcohol, not furnished by hosts, set off fireworks, not provided by the hosts, played dangerous games, engaged in horseplay around swimming pools, and so forth"). The imposition of a duty in the instant case is predicated on the affirmative permission Kask gave Rivers to store firearms on her property for an extended period of time, knowing that an unstable and violent person had regular and unsupervised access to the property. Ordinarily, the number of persons who live with a property owner and store such dangerous instrumentalities in common space are vastly smaller than the number of guests who enter the premises for a party or some other short-term event. And the property owner certainly has more of an interest in learning of, and more time to accept or reject, an item kept on her premises by longer-term guests. Contrast *id.* at 734 n.5 ("We reject the plaintiff's claim that the defendant . . . by watching the fireworks, gave tacit approval for their use, and so effectively had control over the situation . . . .")

Moreover, this is not a case where the homeowner is required to control the actual use of property that a third person has brought into the home. Contrast *Ulwick* v. *DeChristopher*, 411 Mass. 401, 406 (1991) ("The ability effectively to control a guest's excessive drinking is not present when the liquor belongs to the guest"). The duty contemplated in this case is one of ensuring that, where a property owner has agreed to permit firearms to be stored on her property in a location used by both her and the owner of the firearms, the firearms are secure and not accessible to others who also have been granted unfettered access to the home and might make improper use of them.[10]

This is not a case where recognition of a duty would open the door to liability for almost all actions or omissions by the defendant. Contrast *Remy* v. *MacDonald*, 440 Mass. 675, 677-678 (2004) (because almost "all aspects of a woman's life may have an impact, for better or worse, on her developing fetus," imposing duty on pregnant woman not to harm fetus negligently would present almost unlimited number of circumstances where liability could attach). Here, the duty is limited to a property owner's voluntary and substantial (long-term) connection to a dangerous instrumentality.

We are persuaded that there is a significant social benefit to be realized by recognizing a duty of the person in control of the premises to exercise due care with regard to the storage of guns on the premises, particularly with respect to those who have been granted regular access to it. *Volpe* v. *Gallagher, supra* at 717, quoting *Irons* v. *Cole, supra* at 6. Our conclusion is consistent with legislative enactments acknowledging that the unauthorized use of firearms is a significant problem and placing requirements on owners of guns for the purpose of preventing their use by persons not competent to use them. See *Com-*

---

[10] We have previously held landowners responsible for a third party's storage of items in an area controlled — exclusively or coextensively — by the landowner. See *Ross* v. *Broitman*, 338 Mass. 770, 771 (1959) (landowner can be found negligent where fire was intensified because tenant kept "large accumulation of paper and cardboard . . . in the first floor common hallway . . . which was in the control of the defendant, had been in plain view and known to the defendant for some weeks or months"). See also *Chalfen* v. *Kraft*, 324 Mass. 1, 4 (1949) (landowner negligent for fire started by cigarette thrown onto papers that accumulated in cellar where "defendant had the possession and control [of the area] which normally accompany ownership").

*monwealth* v. *Parzick*, 64 Mass. App. Ct. 846, 849 (2005), quoting *Commonwealth* v. *Lee*, 10 Mass. App. Ct. 518, 523 (1980), and *Ruggiero* v. *Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 258 (1984) ("statutory scheme governing gun control evidences a legislative purpose 'to prevent the temptation and the ability to use firearms to inflict harm, be it negligently or intentionally, on another or on oneself.' . . . '[T]he goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons' and the Legislature has adopted a wide range of methods 'to accomplish this goal, including . . . the imposition of serious penalties for infractions of the firearms control laws' "). These enactments include a measure requiring gun owners to ensure that the firearms they own are "secured in a locked container" when stored. See G. L. c. 140, § 131L (*a*) ("It shall be unlawful to store or keep any firearm . . . in any place unless such weapon is secured in a locked container or equipped with a tamper-resistant mechanical lock or other safety device, properly engaged so as to render such weapon inoperable by any person other than the owner or other lawfully authorized user. For purposes of this section, such weapon shall not be deemed stored or kept if carried by or under the control of the owner or other lawfully authorized user"). While this statutory provision does not create a duty on the part of persons who are neither gun owners nor lawfully authorized users, it is illustrative of the societal concern with weapons reaching the hands of unauthorized users. Accord *Stoelting* v. *Hauck*, 32 N.J. 87, 96 (1960) ("Firearms have been a subject of legislative control, which indicates a recognition of damage which may ensue from the use of a dangerous instrument, especially in incompetent or unqualified hands").

"The evolution of the law of negligence has always required courts to make hard (and fine) distinctions . . . ." *Cyran* v. *Ware*, 413 Mass. 452, 460 (1992). None of our previous cases concerning landowner negligence for the use of a firearm by a third party is controlling in the factual situation presented here. See, e.g, *Sabatinelli* v. *Butler*, 363 Mass. 565 (1973) (father not negligent for failing to control son's misuse of his own firearm where father did not know of son's record of misuse of firearms);

*Sojka* v. *Dlugosz*, 293 Mass. 419 (1936) (whether father negligent for letting sons use his rifle); *Gudziewski* v. *Stemplesky*, 263 Mass. 103 (1928) (whether parents who knew child possessed handgun negligent for not taking it away); *Souza* v. *Irome*, 219 Mass. 273 (1914) (father negligent for permitting his son to have gun). And cases most similar to the present one, *Andrade* v. *Baptiste*, 411 Mass. 560 (1991),[11] and *McDonald* v. *Lavery*, 27 Mass. App. Ct. 1108 (1989),[12] do not foreclose the conclusion we reach today.

Kask nonetheless points to the court's discussion in the *Andrade* decision regarding the inapplicability of the Restatement (Second) Torts, *supra* at § 318.[13] In *Andrade* v. *Baptiste*, *supra* at 562, the plaintiff argued that defendant, "as sole owner of the marital home, owed a duty . . . to prevent [her husband] from storing the rifle . . . on her property." The plaintiff "reason[ed] from the principles in § 318 that the defendant 'could have

---

[11]*Andrade* v. *Baptiste*, 411 Mass. 560 (1991), primarily concerned the use, not storage, of a firearm by the gun owner himself. Because the defendant "had no legal ability . . . to control her husband's misuse of his own property," she "therefore, [had] no accompanying duty" to do so. *Id.* at 563. Put more aptly, even if the defendant had required the husband to store or safeguard his firearm in some other way than he did, she had no capacity to prevent him from retrieving and using his firearm, and thus to impose a duty to do so would be improper. See *id.* at 564-565 (referencing *McDonald* v. *Lavery*, 27 Mass. App. Ct. 1108 [1989], and concluding that "in the parent-child relationship, liability has not been imposed on facts similar to those here even though parents arguably are able to exercise even more control over their child than a wife can assert over her husband").

[12]*McDonald* v. *Lavery*, *supra*, did not address a negligent storage claim. Rather, the plaintiff in that case asserted that the defendant was negligent for failing "adequately to supervise and control" their adult son while he resided with them. *Id.* at 1108. The son used his own rifle to shoot a friend after a night of drinking. The question was whether the fact that their son lived with the defendants or that they were his parents "impose[d] on [them] the duty to supervise and control" him. *Id.* at 1110, quoting *Alioto* v. *Marnell*, 402 Mass. 36, 39 (1988). The Appeals Court concluded that there was no such duty in the circumstances of the case.

[13]That section states: "If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor (a) knows or has reason to know that he has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) Torts § 318 (1965).

required [her husband] to install locks on the . . . storage areas, refused to permit . . . assault weapons to be stored on the premises, or exercised numerous other measures of control to prevent him from having easy . . . access to a deadly weapon . . . [including] . . . insis[ting] that [her husband] move out.' " *Id.* While Kask is correct that we found § 318's principles inapplicable, we did so because we concluded that the husband's use of his own gun (to shoot an employee of a neighboring store) was not the "use of [the defendant's] property . . . in the sense contemplated by § 318." *Id.* at 563. The circumstances in this case, however, and particularly the use of the Kask home for the storage of a collection of guns, bring it much closer to what § 318 contemplates.

Even if this case would not fit precisely under the rubric of § 318, that section is consistent with our conclusion that the duty we impose today is not in irreconcilable tension with "the general rule that 'a landowner has [no] duty to protect another from intentional criminal acts of third parties which take place on . . . the public way.' " *Volpe* v. *Gallagher*, 821 A.2d 699, 715 (R.I. 2003), quoting *Ferreira* v. *Strack*, 636 A.2d 682, 686 (R.I. 1994). Rather, this duty is one of a number of limited exceptions to that general rule, where both the doctrine of fore-seeability and sound public policy counsel an alternative conclusion. In consideration of emerging social customs and values, as well as appropriate social policy, we hold that a home-owner who permits a guest to keep guns permanently on her premises and allows a third person with a criminal history and mental difficulties unsupervised access to the property, has a duty to ensure that the firearms are properly and safely stored. We therefore reverse the grant of summary judgment on this claim and remand the case for further action.

4. *Strict liability and public nuisance claims.* In addition to pressing a claim against Kask for negligence, Jupin asserted that Kask should be held strictly liable for any harm resulting from the use of the firearms she allowed to be kept on her property, and that the improper storage of the firearms (even though unloaded) constituted a public nuisance, giving rise to her liability for any harm resulting therefrom. The judge granted Kask's motion for summary judgment on both of these counts.

In support of strict liability, Jupin argued that the firearm taken by Jason from Kask's property was a dangerous instrumentality and that "one who for his own benefit keeps a dangerous instrumentality should be liable per se for [the natural consequences of] its escape," which in this case was the murder of Officer Jupin. See *Clark-Aiken Co.* v. *Cromwell-Wright Co.*, 367 Mass. 70, 86 (1975). The judge concluded that strict liability did not apply on these facts because Officer Jupin's injuries were not the direct consequence of the alleged improper storage of the gun. Cf. *O'Connor* v. *E.J. DiCarlo & Sons*, 376 Mass. 927, 927-928 (1978) (denying plaintiffs' damage "caused . . . by tremors occasioned by [defendant's] blasting" because tremors did not constitute direct consequence of abnormally dangerous activity). He added that the damage in this case was not a natural consequence of the alleged improper storage of the firearm, but was caused by an intervening act of a third party.

Jupin concedes that "there is no Massachusetts case imposing strict liability for the unsafe storage of firearms." Indeed, we are not aware of, and have not been pointed to, any jurisdiction that imposes such liability on similar facts. Even were this not so, we would not conclude that the storage of firearms in the circumstances of this case creates strict liability for the owner of the premises in which the firearms are stored. This is because such storage is "neither ultrahazardous nor extraordinary." *Fibre Leather Mfg. Corp.* v. *Ramsay Mills, Inc.*, 329 Mass. 575, 577 (1952), quoting *Ainsworth* v. *Lakin, supra* at 400-401 (strict liability "applies to unusual and extraordinary uses [of land] which are so fraught with peril to others that the owner should not be permitted to adopt them for his own purposes without absolutely protecting his neighbors from injury or loss by reason of the use"); *Clark-Aiken Co.* v. *Cromwell-Wright Co., supra* at 84. See *United Elec. Light Co.* v. *Deliso Constr. Co.*, 315 Mass. 313, 321-322 (1943), quoting *Ainsworth* v. *Lakin*, 180 Mass. 397, 399 (1902) ("The application of the doctrine [of strict liability] . . . has been limited in this Commonwealth 'to such unusual and extraordinary uses of property in reference to the benefits to be derived from the use and the

dangers or losses to which others are exposed, as should not be permitted except at the sole risk of the user' ").[14],[15]

In support of her theory of public nuisance, Jupin argued that Kask's improper storage of the firearms in her home interfered with public health, morals, and safety, and that this interference was a result of Kask's "negligent, reckless, and ultrahazardous" conduct. *Stop & Shop Cos.* v. *Fisher*, 387 Mass. 889, 891 n.2 (1983). The judge first noted the vast gap between this case and traditional public nuisance cases, such as "those involving highways and navigable streams" or "the keeping of diseased animals or the maintenance of a pond breeding malarial mosquitos." He then noted that "[p]roperty owners are permitted to store firearms in their homes." Finally, he concluded that "[t]o hold that the storage of firearms constitutes a public nuisance" would be "inappropriate."

Jupin cites no authority from any jurisdiction applying a public nuisance theory to the ownership, possession, or storage of a firearm. We decline to take such a novel step.[16] The storage of legally acquired firearms in a home is not among nor analogous to "guidelines as to what is covered by traditional [public nuisance] doctrine." *Leary* v. *Boston*, 20 Mass. App. Ct. 605, 609-610 & n.6 (1985), quoting Restatement (Second)

---

[14]That we consider guns to be dangerous instrumentalities requiring a heightened degree of care does not automatically mean that storage of such guns qualifies as an ultrahazardous or extraordinary use for strict liability treatment. Accord *Jacoves* v. *United Merchandising Corp.*, 9 Cal. App. 4th 88, 116 (1992) ("Even though firearm use or possession has not been elevated to an ultrahazardous activity resulting in the imposition of absolute liability, civil laws hold firearm use or possession to the highest standard of due care. Even a slight deviation from this standard in the use or possession of a firearm may constitute actionable negligence").

[15]Even if we expanded strict liability to the storage of other person's firearms on one's property, Jason's theft of the gun with which he shot Officer Jupin would relieve Kask of liability under this theory. See *Clark-Aiken Co.* v. *Cromwell-Wright Co.*, 367 Mass. 70, 90 n.21 (1975) ("In cases where the doctrine of strict liability would otherwise be applicable on the facts, the defendant can avoid liability by showing that the 'escape' was caused by an . . . intervening unlawful act of a third person").

[16]We do not today foreclose the possibility that some far more egregious conduct with respect to firearms might constitute a public nuisance. We do hold, however, that the home storage of unloaded, legally purchased and owned firearms, even in a poorly locked gun cabinet, does not constitute a public nuisance.

Torts § 821B comment b (1979) ("At common law public nuisance came to cover a large . . . group of minor criminal offenses, all of which involved some interference with the interests of the community at large — interests that were recognized as rights of the general public entitled to protection. Thus public nuisances included interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes; with the public safety, as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets; with the public morals, as in the case of houses of prostitution or indecent exhibitions; with the public peace, as by loud and disturbing noises; with the public comfort, as in the case of widely disseminated bad odors, dust and smoke; [and] with the public convenience, as by the obstruction of a public highway or a navigable stream . . ."). Quite evidently, the instant case comes closest to the traditional interference with public safety by way of storing explosives in the midst of a city. However, where explosives stored in the middle of a city create a public nuisance because they might simply go off, causing loss of life outside the property on which they are stored, unloaded firearms do not possess the same capabilities. Cf. *Leary* v. *Boston, supra* at 610 ("keeping of diseased animals or the maintenance of a pond breeding malarial mosquitoes adversely affects members of the public whether or not they are on the subject property"). Unloaded firearms do not, in and of themselves, discharge. Thus, they do not inherently interfere with or threaten the public safety and are not appropriately considered a public nuisance.[17] Any injury to the public in the circumstances of this case was not the result of the allegedly improper storage (however characterized), but of the theft and use of the gun by a third party. Whatever public nuisance might have existed with reference to the murder of Officer Jupin was not the result of Kask's conduct.

5. *Conclusion.* Because we conclude that the doctrines of

[17]The decision of the judge below could be read to rely on an inaccurate assumption — that the gun cabinet was securely locked or at least, that Kask was not negligent in failing to discover otherwise. However, we may affirm the grant of summary judgment on any ground apparent from the summary judgment record.

strict liability and public nuisance are inapplicable to the storage of unloaded firearms in a private home in the circumstances here presented, we affirm the grant of summary judgment in favor of the defendant on those two counts. However, because we conclude that the defendant owed a duty of reasonable care to the plaintiff relative to the storage of firearms kept in her home, to which a mentally unstable and violent person was given unsupervised access, we reverse the grant of summary judgment on that count.

*So ordered.*