Feeley, Timothy Q., J.
Plaintiff Patrick Deheer (“Deheer”) is a podiatrist and was a member of the defendant American Academy of Podiatric Practice Management (the “Academy”). While a member, Deheer invested money with a private financial advisor held out and promoted by the Academy as a “Corporate Partner” of the Academy. The financial/investment advisor stole Deheer’s substantial investment and is currently serving or recently concluded a jail term for similar criminal conduct. Deheer seeks by means of this action to hold the Academy liable for his losses from his investments with the financial/investment advisor. Essentially, as discussed in detail below, Deheer alleges that the Academy promoted the financial advisor as part of the resources available to its members and should have known, prior to Deheer’s investments, that the financial advisor had lost his securities license and had been barred from the New York Stock Exchange for fraud and theft similar to that which caused Deheer’s losses.
The first amended complaint alleged five claims: (1) breach of fiduciary duly; (2) negligence; (3) breach of contract; (4) negligent misrepresentation; and (5) violation of G.L.c. 93A. [D. 4.) The Academy moved to dismiss all claims under Mass.RCiv.P. 12(b)(6), for failure to state causes of action upon which relief could be granted. [D. 5.] A non-evidentiaiy hearing was held on February 11, 2010. On February 16, 2010, the court (Feeley, J.) issued a memorandum of decision, dismissing three of the five claims in the first amended complaint. [D. 9.] The court concluded that only Counts Two and Four, alleging negligence and negligent misrepresentation survived the Rule 12(b)(6) motion. The court’s decision was based on the four comers of the first amended complaint, plus the exhibits attached thereto, which consisted of the Academy’s membership/recruitment brochure and printouts of selected pages of the Academy’s website that pertained to the Academy’s Corporate Partners program.
To ultimately prevail on its negligence claim, Deheer must prove that the Academy owed him a duty of reasonable care, that the Academy committed a breach of that duty, that damage resulted, and that there was a causal relation between the breach of duty and the damage. See Jupin v. Kask, 447 Mass. 141, 146 (2006), citing J.R. Nolan & L.J. Sartorio, Tort Law §11.1 (3d ed. 2005); Bennett v. Eagle Brook Country Store, Inc., 408 Mass. 355, 358 (1990). Whether a duty of care exists is a question of law, Jupin, 447 Mass. at 146, and was an appropriate subject of a motion to dismiss pursuant to rule 12(b)(6). See O’Meara v. New England Life Flight, Inc., 65 Mass.App.Ct. 543, 544 (2006) (affirming dismissal under Rule 12(b)(6) on ground that defendants owed no duty to plaintiff). See also Remy v. MacDonald, 440 Mass. 675, 677 (2004) (“If no such duty exists, a claim of negligence cannot be brought”). The Academy argued that it had no duty to conduct a continuing due diligence check on *205 Lafferty during the time he was a Corporate Partner. It argued that a trade association’s promotion of commercial products and services does not create a duty owed to its members with respect to the quality of those services. In denying the motion to dismiss the negligence claim, the court stated:
In most instances the court would agree with the Academy, and may ultimately agree at a later stage of this litigation. But the issue before the court is dismissal under the lannacchino standard, and the issue as to whether the Academy created a duty to its members in the unique circumstances alleged in the amended complaint is too close a call for this court to conclude that the negligence count fails plausibly to suggest an entitlement to relief.
The court concluded that “Deheer should be permitted to try to establish that the Academy had a duty not to promote such a person, with a public record of misappropriations, as a person to whom members should trust their monies and investments.”[1]
Following the court’s ruling, the Academy filed its answer to the first amended complaint. [D. 12.] Discovery then commenced, which included the deposition of Deheer. On December 12, 2010, the Academy filed under Rule 9A its motion for summary judgment on the two remaining claims/counts in the first amended complaint. [D. 21.] A non-evidentiary hearing was held on January 4, 2011. For reasons discussed below, the Academy’s motion for summary judgment is ALLOWED.
BACKGROUND[2]
The Academy is a not-for-profit, unincorporated trade association affiliated with the American Podiat-ric Medical Association. Podiatry is the practice of providing medical care and treatment to the human foot and ankle. Deheer is a podiatrist who practices and lives in Indiana. The Academy is podiatry’s only association dedicated exclusively to practice management education. Its management offices were, at all relevant times, located in Middleton, Massachusetts. Its membership includes podiatrists, assistants, and staff members. According to its own literature (i.e. membership/recruitment brochure), the Academy provides its membership with practice management education and resources to help them practice more successfully, happily, and profitably. Its mission statement claims it “exists to advance the study of podiatric practice management and promote success through sharing knowledge.” The Academy’s membership brochure proclaims: “through the Academy’s exceptional meetings, mentoring programs, Website, educational monthly conference calls, biweekly blast faxes, and e-mails and education from our corporate partners, you will learn now to ethically maximize your revenue, reduce your costs, and provide better patient care.” The brochure also announces: “Great Resources at a great practice management Website— www.AAPPM.com—Members have access to a wide variety of podiatric practice management resources and modifiable templates, including office policy manuals, buy-in and buy-out agreements, staff hiring and firing guidelines, a job bank, financial planning strategies and management, and links to dozens of other helpful practice management sites and resources through our Website.” The brochure also announces money savings discounts from the Academy’s Corporate Partners, and refers readers to its website.
Beginning in or about 2001, the Academy began a Corporate Partners program. Corporate Partners are independent and separate (from the Academy) businesses. Corporate Partners are entities which a podiatry member or members of the Academy recommend or suggest as being or potentially being interested in supporting the Academy, and whose products or services might be of interest to other members of the Academy. Corporate Partners pay the Academy an annual fee for the designation/status, and obtain promotion on the Academy’s website and access to its members at its annual convention/meetings for purposes of marketing their products and services, or otherwise making presentations or lectures concerning their product or services, to Academy members. Whether any product or service is used or purchased by an Academy member is up to the individual member.
The Academy’s website at the time relevant to Deheer’s claims listed twenty-four Corporate Partners. Lafferty and Partners, LLC and Jeffrey S. Lafferty (“Lafferty”), the financial services provider to whom Deheer entrusted monies, is the only listed Corporate Partner providing that type of service. Most Corporate Partners offered foot care products of one sort or another, while some offered more management-type products such as website, marketing, and consulting advice. Twelve of the twenty-four listed Corporate Partners remain as part of the current twenty-five Corporate Sponsors.[3]
The website, at the time relevant to Deheer’s claims, under the caption “Corporate Partners" stated:
The Academy has a very special relationship with its Corporate Partners, who are carefully selected. We believe all of these companies offer exceptional products and services that can help our members provide better patient care and practice more efficiently and profitably. All of these companies have a proven track record regarding their commitment to podiatry and to the Academy.
Our Corporate Partners are invited to exhibit at each of our meetings and we consider them an integral part of our education program. Our presenters and corporate vendors can show you how to build your practice by using podiatric products and services such as: Orthoses, AFO’s, diagnostic ultrasound, practice management software, wound care dressings, podiatric pharmaceuticals, podiat-ric pathology, digital x-ray, physical therapy, pad *206 ding and strappings, custom filled shoes and dispensing products such as creams and gels. Our Corporate Partners support the Academy and podiatry, and we ask you to support them.
Many of our Corporate partners have special offers and discounts available to AAPPM members. To learn more about these special offers and discounts visit our Members Only Section and click on Offers by Corporate Partners.
A listing of Corporate Partners followed on the website, including:
Lafferty and Partners, LLC
Jeffrey S. Lafferty, JD
48 Broad Street, Suite #153
Red Bank, NJ 07701
Phone: 732-887-0230 Fax: 215-453-9074
E-mail: jefflafferty5 @aol com
Product or service: private wealth management, Financial Planning, Retirement Planning, Business Planning
A separate part of the Academy’s website listed convention speakers, including Lafferty. His “bio” included a photograph and the following:
Based in Red Bank, New Jersey, the firm Lafferty & Partners specializes in private wealth management and consulting to podiatrists nationwide. The firm provides strategic solutions to issues in the areas of business planning, tax reduction strategies and personal financial planning.
In addition to providing specialized services to established podiatrists, the firm also provides strategic planning to early career professionals in the areas of lending, business plan implementation and debt management.
Mr. Lafferty is a frequent speaker and author for the AAPPM, APMA, APMA News, Podiatry Online and Podiatry Management Magazine. Lafferty & Partners is a Corporate Partner of the AAPPM.
Lafferty, then with Somerset Financial Corp., a large and apparently well respected investment broker and dealer firm in Princeton, New Jersey, became a Corporate Partner of the Academy in 2001.[4] During the time that Lafferty was a Corporate Partner (2001-2007), he paid the Academy approximately $28,000 in sponsorship fees. The Academy received no monies from Lafferty in connection with any particular services he provided to Academy members. During that time, Lafferty spoke at eleven Academy conferences/work-shops. In particular, Lafferty was an exhibitor at the Academy’s national conventions in the summers of 2004 and 2005 and solicited Academy members to start retirement accounts and invest their money through his firm.
Deheer joined the Academy in 2004, and continues to be a member. He owns and operates his own podiatry practice known as Hoosier Foot & Ankle, LLC, which has six offices in Indiana. He is also co-owner and CEO of a day surgery center in Indianapolis. He is a fellow of the American College of Foot & Ankle Surgeons and a member of several national and statewide podiatry associations. Deheer attended the Academy’s summer conferences in Chicago in 2004 and 2005, and listened to Lafferty’s presentations both of those years. Lafferty was one of approximately fifty-seven speakers/presenters in 2004, and one of approximately twenty-five speakers/presenters in 2005. The 2004 brochure for the conference scheduled Lafferty for a thirty-minute presentation entitled “Get A Grip On Your Financial Future.” The 2005 brochure had no such detail, but Deheer recalls Lafferty speaking about “Practice Debt Reduction.” Deheer met with Lafferty at the 2005 conference in a small breakout group. Deheer knew and understood that he was not required to use any of the products or services of Corporate Partners and that it was up to the particular Academy member whether he/she wanted or needed the particular product or service offered by Corporate Partners.
A few months after the 2005 summer conference, Deheer contacted Lafferty and discussed how Deheer could manage his debt or consolidate his loans related to his podiatry practice. Deheer and Lafferty then proceeded to talk on the phone every day for a lengthy period of time. The discussions included debt financing, consolidating loans, and potentially saving money by having the practice handle its own payroll and 401K plan. During this time, Lafferty assisted and advised Deheer in obtaining a new SBA loan as well as another loan to add extra capital to his practice. During this time Deheer met face-to-face with Lafferty twice. They met when Lafferty spoke at an Indiana Podiatric Medical Association meeting and went out to dinner (with others) at that time. Deheer also arranged for Lafferty to visit and speak to his staff at his Indiana offices. Additionally, Deheer spoke with, met with once, and received advice from an associate/partner of Lafferty’s named Vincella Ross. Deheer was personally impressed with Lafferty and found him articulate and knowledgeable.
In or about late 2005, Deheer decided to terminate the company he had hired to handle his company’s payroll and 401K plan. Deheer had his own 40 IK plan that he began before opening his current practice, which was administered by Fidelity. The 40IK plan Deheer started in his current practice was with John Hancock. Both plans involved Deheer’s selection of available funds for the investments of his 40 IK monies. Lafferty offered to run or handle the practice’s 40 IK plan and Deheer decided to use Lafferty for financial advice for debt reduction issues and to have Lafferty manage the practice’s 40IK plan. Deheer transferred to Lafferty the 40IK monies from the *207 Fidelity account and the John Hancock account (approximately $40,000) in late November or early December 2005. In late May 2006, Deheer transferred $75,000 of non-401K plan monies to Lafferty to be placed in some type of money market account that Lafferty was to set up. The only bank statement Deheer received from Lafferty regarding his 40 IK plan monies was in March 2006. He never received any statement pertaining to the $75,000 of non-401K plan monies delivered to Lafferty.
In addition to Deheer, three employees of his practice opted to have their 40IK plan monies administered by Lafferty. One of those employees left Deheer’s practice in January 2007 and had difficulty transferring her 40IK monies from Lafferty. Lafferty’s failure to respond to the former employee in February and March 2007 raised red flags about Lafferty in Deheer’s mind.
In or about late January 2007, an Academy member informed the Academy that Lafferty may have been disciplined by the New Jersey Bureau of Securities and the New York Stock Exchange (the “NYSE”). This member had talked to Lafferty about financial services and apparently had conducted his own investigation of Lafferty. Armed with this information, the Academy contacted Lafferty and Vincella Ross, and then conferred with its own counsel. As a result, the Academy discontinued any association with Lafferty and his firm and sent a notice to all Academy members to that effect on February 6, 2007.
On August 4, 2004, the NYSE issued an Exchange Hearing Panel decision permanently barring Lafferty from membership or approved person status with the NYSE or as to any employment or association with any member or membership organization of the NYSE due to charges, inter alia, that Lafferty misappropriated customer funds. As a result of this NYSE finding, on October 29,2004, the New Jersey Bureau of Securities revoked Lafferty’s agent registration. In 2008, Lafferty, in an unrelated criminal matter, pleaded guilty to stealing more than $500,000 from various clients, including certain podiatrists. He pled guilty to charges of securities fraud, theft by deception, conspiracy and money laundering and was sentenced to ten years in prison.
The Academy was unaware of any asserted wrongdoing by Lafferty prior to January/Februaiy 2007. Deheer was likewise not aware of any problem or concern with Lafferty prior to February 2007, finding Lafferty impressive, articulate, knowledgeable, and very helpful to him in consolidating and reducing his office debt.
DISCUSSION
A motion for summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). The moving party, here the Academy, bears the burden of affirmatively demonstrating the absence of a triable issue and that the record entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party who does not bear the burden of proof at trial, like the Academy, may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991). Here, in its primary argument, the Academy contends that it has satisfied its burden in both of the permissible ways, negating an essential element of the negligence claim asserted by Deheer (i.e., duty of care), and demonstrating that Deheer has no reasonable expectation of proving that the Academy owed him a duty of care. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact.” Pederson, 404 Mass. at 17. The non-moving party cannot defeat a motion for summary judgment by resting on the pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). In deciding motions for summary judgment, the court may consider pleadings, deposition transcripts, answers to interrogatories, admissions on file, and affidavits. Mass.R.Civ.P. 56(c). The court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
1. Negligence Claim
To prevail on his negligence claim, Deheer must prove that the Academy owed him a duty of reasonable care, that the Academy committed a breach of that duty, that damage resulted, and that there was a causal relation between the breach of duty and the damage. See Jupin, 447 Mass. at 146, citing J.R. Nolan & L.J. Sartorio, Tort Law§ 11.1 (3d ed. 2005); Bennett, 408 Mass. at 358. Whether the final three elements of a negligence claim are established, that is, breach of a duty, damages, and causation, are questions for a jury. Jupin, 447 Mass. at 146. However, “(t)here can be negligence only where there is a duty to be careful.” Theriault v. Pierce, 307 Mass. 532, 533 (1940). Whether there is a duty to be careful is a question of law, Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 156 (1983), and is an appropriate subject of summary judgment. Jupin, 447 Mass. at 146. The existence of such a duty is determined “by reference to existing social values and customs and appropriate social *208 policy.” Id. at 143, quoting Cremins v. Clancy, 415 Mass. 289, 292 (1993).
Here, there is no challenge by Deheer to the initial designation of Lafferty as a Corporate Partner. Thus, the question before the court is not whether a trade association has a duty of care in the selection of independent providers of products and/or services endorsed and promoted by the association. The initial question properly framed for this court is whether, under the circumstances of this case, a trade association has a duty of reasonable care in the form of continuing due diligence to ensure that a commercial sponsor whose products or services it endorses and promotes to its membership continues to meet certain standards of integrity and/or excellence. “If no such duty exists, a claim of negligence cannot be brought.” Remy, 440 Mass. at 677 (summary judgment affirmed on basis defendant mother did not owe a duty of care to her unborn child).
It is important, in answering this question, not to focus solely on the services offered by Lafferty and the damage/loss alleged to have resulted from his criminal conduct. The question of a general duty owed, as opposed to a duty assumed, is not so limited.[5] The question of such a general duty is broader and is not answered by focusing only on the Academy’s relationship with and promotion of Lafferty. If the Academy has a legal duty to continually monitor Lafferty’s services, it also has such a duty with respect to continually monitoring ortho-paedic devices, skin and foot care products, pain relieving gels, ultrasound machines, foot pads, po-diatric pharmaceuticals, podiatric websites, computer backup services, digital imaging systems, and technology and consulting services offered by various of the Corporate Partners that existed in the 2004-2005 time frame. A trade association such as the Academy is exactly that, a trade association, and not a consumer reports agency, and this court does not believe that custom and social policy would expect a trade association to have or obtain intimate knowledge or expertise in the many specialty areas represented by the wide variety of commercial sponsors it might promote.[6] If the Academy has a legal duty to continually monitor Lafferty, it must be based on the court’s conclusion, that it does not make, that trade associations generally (at least when they receive no financial benefit from any business dealing between association members and commercial sponsors of the association) have such a duty with respect to the products and services they might endorse and promote for their members’ consideration. Deheer has suggested no precedent for such a general duty and the court has found none.
Keeping in mind that the existence of a negligence-related duty is determined “by reference to existing social values and customs and appropriate social policy,” this court concludes that a duty does not exist for a trade association such as the Academy to continue to perform due diligence to ensure that a commercial sponsor whose products or services it endorses, promotes, and encourages to its membership continues to meet certain standards of integrity and/orexcellence.[7] This seems even clearer in the context of harm, as alleged here, recovery for which would be barred by the well-establish tort principle that purely economic losses are not recoverable in a negligence action in the absence of personal injury or property damage. FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993); Cumis Ins. Society, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 469 (2009). It is clear to this court that the Corporate Partner designations of the sort made by the Academy reflect a commercial arrangement entered into to enhance a trade association’s revenues, and are not an undertaking by the trade association to ensure on a continuing basis the bona fides of its commercial sponsors. It is also clear that the arrangement in this case involves receipt by a trade association of sponsorship fees to support the association’s activities in exchange for the association providing the commercial sponsors access to its membership for direct sales and marketing of the sponsors’ products and/or services.
Importantly, this sort of arrangement results in any selection by an association member of a sponsor’s products or services being an independent business transaction between the member and the sponsor. No member is forced or obligated to purchase a product or service from a commercial sponsor. After what is effectively an introduction and endorsement, the trade association steps back and is not involved in any transaction or relationship that then occurs. The trade association’s financial benefit, in this sort of arrangement, is complete with acceptance of a commercial sponsor’s fee, as it receives no financial benefit from any business directed to a sponsor by a member of the trade association.[8]
Certainly, commercial sponsorship designation by a trade association might be some sort of representation about the bona fides of the sponsor. It could be that a trade association has a duly of initial due diligence to determine the general reputation of those whose products and services it endorses and promotes. But that is not the question before this court because Deheer has not challenged the initial designation of Lafferty as a Corporate Partner. It could also be that a trade association has a duty to prevent harm to its members from sponsors it promotes based on any risks of which the association was or became aware. But that also is not the question before this court because the Academy had no knowledge of Lafferty’s public record of misappropriating clients’ funds until February 2007, at about the same time Deheer began sensing trouble. Moreover, this court is not willing to conclude that existing social values, customs, and appropriate *209 social policy impose a duty upon a trade association to prevent harm to its members from sponsors it promotes based on risks of harm of which the association should have been aware, which is the duty Deheer asks this court to find.
Finding no general duty to support Deheer’s negligence claim, the court now moves to the question of whether the Academy assumed a duly of reasonable care in the form of continued due diligence by its website representations about its Corporate Partners, including: “The Academy has a very special relationship with its Corporate Partners, who are carefully selected. We believe all of these companies offer exceptional products and services that can help our members provide better patient care and practice more efficiently and profitably. All of these companies have a proven track record regarding their commitment to podiat-ry and to the Academy . . . Our Corporate Partners support the Academy and podiatry, and we ask you to support them.” The court concludes that no duty of continuing diligence was assumed by the Academy by its particular promotion and encouragement to its members to use its Corporate Partners.
It is certainly true that “[i]f a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for [the other’s] protection, that person may be liable for harm caused because of the negligent performance of [the] undertaking.” Thorson v. Mandell, 402 Mass. 744, 748 (1988) (“The YWCA did not assume any duty to Thorson nor did it undertake to render any services to her which the YWCA should have recognized as necessary for her protection”); see also Mullins v. Pine Manor College, 389 Mass. 47, 52 (1983) (“a duty voluntarily assumed must be performed with due care”). Here, even if the court found that the Academy undertook to carefully select Corporate Partners, there is no challenge by Deheer to the initial selection of Lafferty. Moreover, the Academy made no specific representation of any due diligence it undertook, besides an initial “careful selection.” Beyond that, it only undertook to provide an introduction of its Corporate Partners to its membership, and an opportunity for its Corporate Partners to conduct direct sales and marketing efforts within its membership ranks. The Academy did not undertake to render any continuing diligence for the protection of its members like Deheer. Nor should the Academy have know that its continued diligence of its Corporate Partners was necessary for the protection of Deheer and its other members. As found earlier by this court in deciding the Academy’s motion to dismiss, no special or fiduciary relationship existed between the Academy and its members with respect to its promotion of the products or services of its Corporate Partners. Moreover, the Academy was not involved in any interactions or transactions between its members and its Corporate Sponsors, and received no financial compensation for any business generated among its membership by its Corporate Partners. Its members were in as good or better position than the Academy to protect themselves against faulty products or services they obtained from Corporate Partners. This case presents a perfect example of an Academy member being in a much better position than the Academy to protect himself against the harm that occurred. Deheer did notsignupforinvestmentmanagement services from Lafferty at the Academy’s summer conference. He talked daily with Lafferty for an extended period of time after first meeting him at the 2005 summer conference, and met with him several times before entrusting Lafferty with money in November or December of 2005, and again later in May 2006.[9]
2. Negligent Misrepresentation Claim
The parties agree on the elements of a negligent misrepresentation claim, which are as follows: that the defendant (1) in the course of its business; (2) supplied/provided false information for the guidance of another; (3) upon which the plaintiff justifiably relied to his financial detriment; and (4) that the defendant failed to exercise reasonable care or competence in obtaining or communicating the information. Cole v. New England Mutual Life Ins. Co., 49 Mass.App.Ct. 296, 300 (2000); Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 587-88 (1996).
Deheer contends generally that the Academy made a negligent misrepresentation when it included Lafferty among the sponsors that it lauded so enthusiastically and that it consistently promoted Lafferty every year and throughout those years as someone who was a trusted proven resource for members. A basic shortcoming of Deheer’s general contention is apparent. Deheer does not challenge the initial decision to name Lafferty as a Corporate Partner. Thus, the basic misrepresentation claim is that after its initial designation as a Corporate Partner, the Academy’s continued promotion of Lafferty constituted a misrepresentation that Lafferty remained a trusted proven resource for members. To the degree that Deheer viewed the Corporate Partner designation and promotion as such a representation, the court finds that he did not justifiably rely on that representation because he could not reasonably believe that, in the absence of a duly, the Academy conducted the sort of due diligence that would constitute a continuing representation of the bona fides of Lafferty as a Corporate Partner. See Cumis, 455 Mass. at 474 (“Although usually a question for the juiy, whether the plaintiffs’ reliance was reasonable and justifiable can be a question of law where the undisputed facts permit only one conclusion”). The Academy certainly never made a representation of continued due diligence, and this court has specifically held that no such duty of continued diligence existed.
*210 Deheer’s claim fares no better if one looks at the actual statements he claims are misrepresentations. Much as he did in support of his negligence claim, Deheer relies on the following website information: “The Academy has a very special relationship with its Corporate Partners, who are carefully selected. We believe all of these companies offer exceptional products and services that can help our members provide better patient care and practice more efficiently and profitably. All of these companies have a proven track record regarding their commitment to podiatry and to the Academy.” The “carefully selected” phrase cannot be the basis of a misrepresentation because Deheer does not take the position that Lafferty was not carefully selected. The statement that “We (the Academy) believe . . .” is not a statement of fact that can be proven false. It is clearly an opinion, and moreover, is promotional puffery upon which one cannot justifiably rely. Finally, “proven track record” is similarly vague puff-ery, not reasonably relied upon, and moreover, is limited as a reference to Corporate Partners’ track record “regarding their commitment to podiatry and to the Academy.” Thus, because Lafferty’s publicly known integrity issues are not charged or established on the record to reflect a lack of commitment to podiatry or the Academy, the proven track record language cannot be the basis for a negligent misrepresentation claim.
One final reliance argument advanced by the Academy is also persuasive. The first monies transferred by Deheer to Lafferty were 40IK plan funds for which he had fiduciary responsibilities. As pointed out by the Academy, Deheer had a federally imposed fiduciary duty to prudently select investments of any 40IK plan monies. A 40IK plan fiduciary such as Deheer has an independent duty to select and check on any 40IK plan trustee/admin - istrator (such as Lafferty) before selection, and cannot rely on the recommendation or advice of another as to the credentials or suitability of such a trustee. Whitfield v. Malcom, Cohen, Druck Co., 682 F. Supp 188, 195 (S.D.N.Y. 1988) (“The failure to make any independent investigation and evaluation of a potential plan investment is a breach of fiduciary obligations”). Thus, as a matter of law, it was not reasonable or justified for a 401K plan fiduciary such as Deheer to rely on the Academy’s “enthusiastic promotion” of Lafferty as a person to whom 40IK plan monies should be entrusted for investment. In fact, Deheer is currently a defendant in a civil action commenced by the United States Department of Labor that advances a claim of imprudent selection of and failure to monitor a plan service provider (i.e. Lafferty). It easily follows that any reliance Deheer may have placed on the Academy’s promotional statements on behalf of a Corporate Partner to whom 40IK plan funds would be placed was neither reasonable nor justified.
ORDER
The Academy’s motion for summary judgment as to Counts Two (negligence) and Four (negligent misrepresentation) is ALLOWED.

The court also found that the amended complaint made a sufficient showing with respect to Deheer’s claim of negligent misrepresentation.

The court is no longer bound by the four corners of the complaint, plus exhibits attached thereto in considering the motion currently before the court, as it was with the Academy’s motion to dismiss. However, many of the allegations in the first amended complaint, and in particular the contents of the membership brochure and web site pages, are undisputed. The facts found by the court for purposes of the summary judgment motion currently before it will be those undisputed facts from the first amended complaint (and exhibits thereto) plus other undisputed facts developed in discovery.

Sometime after the events in this case, the Academy changed the name of its program from Corporate Partners to Corporate Sponsors. However, this court will use the terminology contained in the Academy’s brochure and website at the time of the events in question, rather than the more recently used designation. The court does not infer any importance to this case of the change in terminology, as Deheer admitted to facts that incorporate the use of the sponsor designation. Accordingly, the court views the change in terminology as a non-issue.

Deheer’s counsel admitted at the hearing that Deheer does not contest or challenge the due diligence regarding the initial decision, or the decision itself, to designate Lafferty as a Corporate Partner.

To the degree that the court phrases the duty question differently now than in its motion to dismiss decision, it does so intentionally, better versed in the facts on the record now before the court, and having given the question more thought and reflection since its earlier decision.

his case makes that point, as Lafferty offered financial and investment services and consulting, and the Academy has no special expertise in those specialty areas.

Phrasing the question in this way is more appropriate, in this court’s view, than phrasing it, as requested by the Academy, in terms of whether the Academy has a duty to protect its members from the criminal conduct of a third party. If the Academy has a duty of continuing due diligence, it has in fact a duty to protect its members from the criminal conduct of its third-parties commercial sponsors that would have or should have been preventable by the required due diligence.

In this case, it was financially irrelevant to the Academy whether Deheer engaged Lafferty’s services. It received no compensation from Lafferty for services he provided to Deheer or to any other Academy member.

In addition to an absence of a general or assumed duty, and even if the court has wrongly decided the duty of care issue, the Academy is still entitled to summary judgment on Deheer’s negligence claim. “[T]he economic loss doctrine bars recovery unless the plaintiffs can establish that the injuries they suffered due to the defendants’ negligence involved physical harm or properly damage, and not solely economic loss. Cumis, 455 Mass. at 469, citing Aldrich v. ADD, Inc., 437 Mass. 213, 222 (2002), quoting FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993) (“purely economic losses are unrecoverable in tort . . . actions”). Deheer’s negligent misrepresentation claim is not similarly restricted. Craig v. Everett M. Brooks Ca., 351 Mass. 497, 499-501 (1967).