NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12409

CARMEN CORREA, administratrix,[1]  vs.  ANDREAS P. SCHOECK
& others.[2]


        Middlesex.     February 6, 2018. - June 7, 2018.

    Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
                        Kafker, JJ.


Pharmacy.  Wrongful Death.  Negligence, Wrongful death,
     Pharmacy.  Interest.  Damages, Wrongful death,
     Interest.  Judgment, Interest.  Practice, Civil, Judgment,
     Interest.



        Civil action commenced in the Superior Court Department on
October 19, 2012.

        The case was heard by Dennis J. Curran, J., on a motion for
summary judgment, and entry of separate and final judgment was
ordered by him.

        The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


        Thomas M. Greene (Michael Tabb & Simon L. Fischer also
present) for the plaintiff.

_____

        [1] Of the estate of Yarushka Rivera.

        [2] New England Neurological Associates, P.C.; and Walgreen
Eastern Co., Inc.

Bruce H. Murray for Walgreen Eastern Co., Inc.

Tory A. Weigand, for Andreas P. Schoeck & another, was present but did not argue.

The following submitted briefs for amici curiae:

Mary Ellen Kleiman, of the District of Columbia, & John F. Brosnan for National Association of Chain Drug Stores, Inc.

Kathleen L. Nastri, of Connecticut, Jeffrey R. White, of the District of Columbia, & Jonathan A. Karon, Thomas R. Murphy, Kristie A. LaSalle, & Kevin J. Powers for American Association of Justice & another.

Wells G. Wilkinson & Victoria Pulos for Health Law Advocates, Inc., & others.


LENK, J.   In this case, we address the novel issue whether a pharmacy has a legal duty to notify a prescribing physician when a patient's health insurer informs the pharmacy that it requires a "prior authorization" form[3] from the physician. Health insurers often require prescribing physicians to submit prior authorization forms to establish that prescriptions for particular medications are medically necessary and cost-effective.  Since it is the pharmacy that submits the claim for reimbursement, however, only the pharmacy, and not the physician or the patient, is notified when a prescribing physician must complete a prior authorization form and submit it to the insurer.

Prior authorization was necessary in order for Yarushka Rivera to obtain insurance coverage for Topamax, a medication she needed to control life-threatening seizures.  Rivera was

---

[3] See 130 Code Mass. Regs. §§ 406.422, 450.303 (2016).

diagnosed with seizure disorder, which is also known as epilepsy, a few months before her nineteenth birthday. Rivera's insurer, MassHealth, twice paid for her Topamax prescription without issue. Once Rivera reached her nineteenth birthday, however, the insurer refused to pay for the prescription because it had not received the prior authorization form required for Topamax patients over the age of eighteen. Her family then made numerous attempts to obtain the prescribed medication from her pharmacy, Walgreen Eastern Co., Inc. (Walgreens), to no avail. Rivera was unable to afford the medication without insurance, and thus could not take her medication in the months before she suffered a fatal seizure at the age of nineteen.

Carmen Correa, Rivera's mother, subsequently brought this action for wrongful death and punitive damages against Walgreens; Rivera's neurologist, Dr. Andreas P. Schoeck (Schoeck); and Schoeck's office, New England Neurological Associates, P.C. (NENA). Correa maintains that Walgreens repeatedly told Rivera and members of her family that Walgreens would notify Schoeck of the need for prior authorization, but Schoeck and NENA deny ever receiving notice. A Superior Court judge allowed Walgreens's motion for summary judgment, on the ground that Walgreens owed no legal duty to Rivera to notify Schoeck and NENA of the need for prior authorization. The judge entered final judgment against Walgreens and stayed the claims

against Schoeck and NENA so that Correa could expedite her appeal.  He also stayed the accrual of prejudgment interest as to Schoeck and NENA pending resolution of the appeal.

Because we conclude that Walgreens had a limited duty to take reasonable steps to notify both the patient and her prescribing physician of the need for prior authorization each time Rivera tried to fill her prescription, we reverse the allowance of summary judgment for Walgreens.  Walgreens's duty extends no further, however -- the pharmacy was not required to follow up on its own or ensure that the prescribing physician in fact received the notice or completed the prior authorization form.  We conclude also that the judge erred in staying the accrual of prejudgment interest.[4]

1.  Background.  a.  Facts.  On May 13, 2009, Rivera suffered a seizure; it appears to have been her first.  Rivera was eighteen at the time and living under the care of her mother, Correa, and her stepfather, Julio Escobar.  Rivera was taken to a hospital, where she was treated for seizure disorder. Upon discharge three days later, a physician at the hospital prescribed her Topamax, an antiepileptic medication.  Later that

---

[4] We acknowledge the amicus briefs submitted by the National Association of Chain Drug Stores, Inc.; the American Association of Justice and the Massachusetts Academy of Trial Attorneys; and Health Law Advocates, Inc., the Massachusetts Law Reform Institute, the Center for Health Policy and Law of Northeastern University, and the Public Health Advocacy Institute.

month, Rivera began seeing a neurologist, Schoeck, who agreed that she should continue taking Topamax.

In June, 2009, Rivera filled the Topamax prescription written by the hospital physician at her local Walgreens pharmacy. MassHealth covered payment for the prescription without incident. Later that month, Rivera and her family tried to refill the Topamax using Schoeck's prescription, but a Walgreens pharmacist explained that it was too early to do so because Rivera had not finished the previous prescription. The pharmacist also informed them that, in the future, MassHealth would require a prior authorization form, to be completed by Rivera's prescribing physician, in order for the insurer to cover the cost of the medication. According to Correa, the pharmacist said that it was Walgreens's policy to notify the prescriber by facsimile or telephone of the need for prior authorization, and that Walgreens would contact Schoeck, but there is no evidence that Schoeck was so notified.

At that time, MassHealth required a prior authorization form to cover the cost of Topamax for individuals over eighteen years of age. Rivera was eighteen when she began taking Topamax, but would turn nineteen shortly thereafter, on August 3, 2009. The prior authorization form is predominantly intended to establish the medical necessity and effectiveness of the prescribed medication, and to ensure that there are not "more

cost-effective alternatives," as MassHealth "strongly advocates the use of generic drugs."  Executive Office of Health and Human Services, Introduction to MassHealth Drug List, https://masshealthdruglist.ehs.state.ma.us/MHDL/pubintro.do [https://perma.cc/5H6U-U6UX].  During the relevant time period, the form used was two pages long and took ten minutes or less to complete; it required entry of information about the patient's MassHealth membership, diagnosis, prescribed medication, basic history, prescriber information, and the prescriber's signature.

A patient's prescribing physician must submit the prior authorization form to MassHealth; pharmacies and patients are unable to complete the form.  MassHealth notifies only the pharmacy of the need for prior authorization, however, because it is the pharmacy that submits the claim for coverage; MassHealth does not notify the patient or the physician when prior authorization is required.  Although they are not required to do so by law or regulation, pharmacists at Walgreens and other pharmacies routinely send a facsimile transmission to the prescribing physician with the relevant patient information to alert the physician to the need for prior authorization, and sometimes place telephone calls to follow up on the required forms.

When prescription coverage is denied by an insurer due a need for prior authorization, Walgreens's computer system

immediately notifies the pharmacist.  Upon issuing the alert, the computer system also allows its employees, with a single "click" of a computer "mouse," to send a facsimile message to the prescribing physician, with the necessary patient and medication information, notifying the physician of the need for prior authorization.  Walgreens pharmacists sometimes also follow up with prescribing physicians regarding prior authorization via telephone, particularly when a patient requests that they do so.  During the relevant time period, however, Walgreens did not have a practice of creating or maintaining records of any communications or attempted communications with physicians regarding the need for prior authorization.

NENA, in turn, receives notices that prior authorization is needed from pharmacies via facsimile on a daily basis.  NENA first learns that a patient requires prior authorization when it receives a facsimile transmission from a pharmacy, not from any other sources; it is rare for patients to contact NENA directly regarding the need for prior authorization.  Upon receipt of a facsimile transmission concerning the need for prior authorization, Schoeck's assistant fills out as much of the prior authorization form as she can and gives the form to Schoeck to complete.  The assistant then submits the form via

facsimile to the insurer on the same day that she receives the notice.

Rivera's family was again able to fill Schoeck's prescription without prior authorization on July 26, 2009, as she was not yet over the age of eighteen. At that visit, a Walgreens pharmacist stated that any future prescriptions would not be covered by MassHealth without the prior authorization form, since she would turn nineteen before the prescription could be refilled. The pharmacist told Rivera's family to inform Schoeck of the need for the form. According to Correa, that pharmacist also assured them that Walgreens would notify Schoeck by telephone or facsimile of the need for prior authorization, as was customary policy. There is no evidence in the record that the pharmacist so notified Schoeck.

Rivera ran out of her Topamax supply in August, 2009. Between July and October, 2009, Escobar spoke with Schoeck's office approximately seven times via telephone concerning the required prior authorization form. Escobar attests that he made these calls to assist Walgreens's efforts, as he and his family relied on Walgreens to obtain the appropriate paperwork from Schoeck's office. He explained that he, Rivera, and Correa would not have known how to obtain the necessary paperwork without Walgreens's assistance. Sometime in August, 2009, Escobar also telephoned a Walgreens employee, who again

recommended that Rivera's family contact Schoeck about the need for prior authorization.

Rivera suffered a second seizure on September 2, 2009, while she was visiting Rhode Island. She was hospitalized and discharged with a small supply of Topamax and a prescription for more of the medication. On September 8, 2009, Rivera, Correa, and Escobar attempted to fill the prescription for Topamax obtained in Rhode Island at the same local Walgreens, but a Walgreens pharmacist stated that MassHealth had again denied coverage due to lack of prior authorization. Correa maintains that this pharmacist also promised to contact Schoeck regarding the necessary form. There is no evidence that Walgreens followed up with Schoeck. At that visit, Rivera and her family were told that they could get the prescription filled if they paid the full $399.99 cost of the medication out of pocket, but they were unable to afford that amount. They told the Walgreens employee that they would contact Schoeck's office again.

Rivera and her family unsuccessfully tried to fill Schoeck's prescription for Topamax four more times, on September 18, September 28, October 12, and October 13, 2009. Correa maintains, and Walgreen denies, that a pharmacist assured Rivera and her family on each occasion that Walgreens would notify Schoeck about the necessary form. Correa and Escobar claim that if Walgreens had not made such assurances, they would

have gone to a different pharmacy to assist them in obtaining prior authorization.  None of Walgreens's employees has any memory of communicating or attempting to communicate with Schoeck or with NENA concerning Rivera's Topamax prescription. Walgreens, along with some of the pharmacists who directly interacted with Rivera's family, conceded knowledge, however, that if a customer suffering from epilepsy suddenly stopped taking Topamax, that customer could suffer a seizure.

According to Correa, at an appointment on October 19, 2009, Rivera told Schoeck that she had not been able to take her Topamax since the end of August, because his office had not completed the necessary paperwork, and he told her that he would have his assistant look into it.  Schoeck and NENA maintain that they were never notified by pharmacists or family members about the need for prior authorization in this case.

Rivera died after suffering a third seizure, on October 29, 2009.[5]

---

[5] In June, 2009, after she suffered her first seizure, Rivera also began seeing a psychiatrist who diagnosed her with bipolar disorder and depression.  The psychiatrist prescribed her Lamictal and Celexa for her mood disorders.  Rivera was able to fill these prescriptions at her local Walgreens without incident.  Two weeks before Rivera's death, the psychiatrist lowered the dosage of Lamictal.  According to Correa, in September, 2009, while Rivera was hospitalized in Rhode Island, Schoeck's assistant told Escobar that Lamictal also was an effective treatment for seizures, so even if Rivera could not

b.  Prior proceedings.  Acting on behalf of Rivera's estate, Correa brought this action for wrongful death and punitive damages against the defendants, alleging that the defendants' negligence caused her daughter's death.  See G. L. c. 229, §§ 2, 6.  Walgreens moved for summary judgment on the ground that it owed no legal duty to Rivera.  The motion judge allowed Walgreens's motion for summary judgment without a written decision, and invited Walgreens to file a motion for entry of a separate and final judgment.

Correa moved for reconsideration, or, alternatively, for entry of a separate and final judgment against Walgreens, and a stay of trial, so that she could appeal from the decision.  In their opposition to Correa's motion, Schoeck and NENA also sought a stay of any accrual of prejudgment interest pending Correa's appeal of the allowance of Walgreens's motion for summary judgment.

The motion judge issued a written opinion denying the request for reconsideration.  In order to facilitate Correa's appeal and to prevent duplicative trials, he entered a separate and final judgment against Walgreens and stayed the claims against Schoeck and NENA.  In addition, the judge stayed the accrual of prejudgment interest, opining that, because Schoeck

obtain Topamax, she would be "fine" if she continued to take Lamictal.

and NENA were not responsible for the delay that the stay of claims would cause, allowing prejudgment interest to accrue during the appeal would result in a windfall to Correa. Correa unsuccessfully moved to alter or amend the judgment.[6]

On appeal, Correa maintains that Walgreens had a legal duty to notify Schoeck of the need for prior authorization or, alternatively, that Walgreens voluntarily assumed such a duty. She also argues that the motion judge erred in staying the accrual of prejudgment interest as to Schoeck and NENA.

2. Discussion. a. Standard of review. "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). We review such decisions de novo, and therefore accord no deference to the decision of the motion judge. Chambers v. RDI Logistics, Inc., 476 Mass. 95, 99 (2016).

---

[6] NENA also sought summary judgment as to the punitive damages claim against it on the ground that it could not be vicariously liable for punitive damages. A different motion judge denied the motion. That judge noted that the complaint alleged gross negligence, and the record presented a genuine issue of material fact whether Schoeck's conduct amounted to gross negligence.

b.  Duty of care.  To prevail in her wrongful death suit, Correa must prove that the defendants were negligent.  Afarian v. Massachusetts Elec. Co., 449 Mass. 257, 261 (2007).  The elements of a negligence claim are that "the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage."  Jupin v. Kask, 447 Mass. 141, 146 (2006).  At issue here is whether Correa can establish a legal duty of care on Walgreens's part.  "[T]he existence or nonexistence of a duty is a question of law, and is thus an appropriate subject of summary judgment."  Id.

"The concept of 'duty' . . . 'is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . .  No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists'" (alterations omitted).  Id., quoting Luoni v. Berube, 431 Mass. 729, 735 (2000).  The duty of care is derived from "existing social values and customs and appropriate social policy."  Jupin, supra at 143, quoting Cremins v. Clancy, 415 Mass. 289, 292 (1993).

Accordingly, "imposition of a duty generally responds to changed social conditions" (citation omitted). Jupin, supra at 147.

In light of the evolving nature of the pharmacist-patient relationship, Walgreens's specific knowledge regarding the need for prior authorization, the industry-wide customs and practices of pharmacies handling prior authorization requests, and the foreseeability of the harm to Rivera, we conclude that Walgreens owed a limited duty to take reasonable steps to notify both Rivera and Schoeck of the need for prior authorization each time Rivera tried to fill her prescription.

i. Pharmacist-patient relationship. The pharmacist-patient relationship is unlike that of a typical store vendor and customer. Pharmacists are no longer "confined to standing behind a counter and distributing prescription medications to patients," and "now also do many other things.'" Van Beek, The Future for Pharmacists: Does Physician-Pharmacist Collaborative Practice Mean Collaborative Liability?, 36 J. Legal Med. 442, 444 (2015). Pharmacists also are particularly well suited to "relay critical information back to prescribers" (citation omitted). Id. See Baker, The OBRA 90 Mandate and Its Developing Impact on the Pharmacist's Standard of Care, 44 Drake L. Rev. 503, 504 (1996) ("During the 1970s, pharmacists began searching for a new role -- one more compatible with their education and knowledge. [They were] [u]nwilling to be

relegated to the simple functions of 'count, pour, lick and stick' . . .").

In Massachusetts, pharmacists are statutorily obligated to take certain steps to identify and prevent medical risks to a patient. General Laws c. 94C, § 21A, requires pharmacists to "conduct a prospective drug review before each new prescription is dispensed or delivered to a patient or a person acting on behalf of such patient." The corresponding regulations of the Board of Registration in Pharmacy specify that the required "prospective drug utilization review" includes a "reasonable effort" to identify, inter alia, instances of "drug-disease contraindication," "incorrect drug dosage or duration of drug treatment," and "drug-allergy interactions." 247 Code Mass. Regs. § 9.07(2)(a) (2013). Upon learning of such dangers, "the pharmacist shall take appropriate measures to ensure the proper care of the patient." 247 Code Mass. Regs. § 9.07(2)(b) (2013). The regulations specifically contemplate that this "may include consultation with the prescribing practitioner and/or direct consultation with the patient." Id.

General Laws c. 94C, § 21A, further requires pharmacists to "offer to counsel" any patient when the pharmacist fills a new prescription, either face-to-face or by telephone, "except when the patient's needs or availability require an alternative method of counseling." "For the purposes of medical assistance

and other third party reimbursements or payment programs, any of the [aforementioned] methods, or a combination thereof, shall constitute an acceptable offer to provide counseling." Id. That these statutes and regulations refer to those obtaining prescriptions as "patients" rather than "customers" also indicates that the relationship between pharmacist and patient goes beyond that of a typical commercial relationship.

Thus, while pharmacists are not required by law or regulation to facilitate prior authorization processes for patients, it is evident that they have some role in furthering the well-being of their patients, and are well situated to assist patients with certain issues regarding their medications.

ii. Specific knowledge.[7] This court has long recognized that pharmacies have a duty to fill prescriptions correctly. Cottam v. CVS Pharmacy, 436 Mass. 316, 320 (2002), citing Andreottala v. Gaeta, 260 Mass. 105, 109 (1927), and Nesci v. Angelo, 249 Mass. 508, 511 (1924). See G. L. c. 94C, § 19 (a) ("The responsibility for the proper prescribing

---

[7] The record before us makes no meaningful distinction between "pharmacists" and "pharmacies," and the parties use the terms interchangeably. We conclude that, in the context of notifying patients and physicians of the need for prior authorization, the duties of pharmacists and pharmacies are coextensive. See generally Cottam v. CVS Pharmacy, 436 Mass. 316, 320-323 (2002) (using "pharmacist" and "pharmacy" interchangeably in finding no duty to warn patients of general side effects of medications).

and dispensing of controlled substances shall be upon the prescribing practitioner, but a corresponding responsibility shall rest with the pharmacist who fills the prescription"). In Cottam, supra at 320-321, this court held that pharmacists do not, however, have a duty to warn patients of general side effects of prescription drugs. The court reasoned that under the "learned intermediary doctrine," which traditionally has been applied to drug manufacturers, "a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer." Id. at 321, quoting McKee v. American Home Prods. Corp., 113 Wash. 2d 701, 709 (1989). Thus, "[r]equiring the manufacturer to provide warnings directly to the consumer would interfere with the doctor-patient relationship." Cottam, supra. The court in Cottam extended the learned intermediary doctrine to pharmacies, as the reasons behind the doctrine applied "with equal force" to pharmacies. Id. at 321-322, citing McKee, supra at 711.

Nonetheless, Cottam left open the possibility that a legal duty exists in circumstances where a "pharmacist failed to act on specific knowledge that he or she possessed regarding danger to a particular customer." Cottam, supra at 322-323 (acknowledging that courts in other jurisdictions have imposed duties on pharmacies in cases that involve "more than a simple

failure to warn," such as "filling a prescription for what the pharmacist knew to be a lethal dose, . . . failing to warn the customer when filling two prescriptions that adversely interact with one another, . . . and . . . failing to warn the customer of the drug's adverse interaction with alcohol where the customer was known by the pharmacist to be an alcoholic").[8]  The "modern trend of case law" is that "the learned-intermediary doctrine does not insulate a pharmacist from liability when he or she has knowledge of a customer-specific risk.  Instead, when a pharmacist has such knowledge, the pharmacist has a duty to warn the customer or to notify the prescribing doctor of the customer-specific risk."  (Footnote omitted.)  See Klasch v. Walgreen Co., 127 Nev. 832, 840 (2011).  See also Happel v. Wal-Mart Stores, Inc., 199 Ill. 2d 179, 197 (2002) ("we hold that a narrow duty to warn exists where, as in the instant case, a pharmacy has patient-specific information about drug allergies, and knows that the drug being prescribed is contraindicated for the individual patient").

We consider this "modern trend" instructive.  Given their role in patient care, pharmacists are trained and well situated to notify patients and physicians when pharmacists have specific

---

[8] See, e.g., Lasley v. Shrake's Country Club Pharmacy, Inc., 179 Ariz. 583 (Ct. App. 1994); Horner v. Spalitto, 1 S.W.3d 519 (Mo. Ct. App. 1999); Hand v. Krakowski, 89 A.D.2d 650 (N.Y. 1982).

knowledge regarding a risk of harm to a particular customer filling a prescription. Contrary to Walgreens's argument, this case is readily distinguishable from the circumstances in Cottam, 436 Mass. at 321, where imposing a duty on pharmacists to warn patients of general medication side effects would have interfered with the doctor-patient relationship. Because MassHealth does not notify prescribing physicians of the need for prior authorization, pharmacies actually facilitate the doctor-patient relationship by notifying the physician of this need, and thus helping to ensure that the patient obtains insurance coverage for the medication that the doctor wants the patient to take. See Horner v. Spalitto, 1 S.W.3d 519, 523 (Mo. Ct. App. 1999) (Pharmacists "are in the best position to contact the prescribing physician, to alert the physician about the dose and any contraindications relating to other prescriptions the customer may be taking as identified by the pharmacy records, and to verify that the physician intended such a dose for a particular patient. We do not perceive that this type of risk management unduly interferes with the physician-patient relationship. Instead, it should increase the overall quality of health care" [footnote omitted]).

To determine whether the duty to act on specific knowledge regarding potential harm to a particular patient extends to situations where prior authorization is needed, we turn to the

relevant industry practices, which tend to indicate the expected standard of care in the industry.

iii.  <u>Industry practices</u>.  The Restatement (Second) of Torts § 299A (1965) (Restatement) provides that, "[u]nless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."  This principle "applies to any person who undertakes to render services to another in the practice of a profession, such as that of physician or surgeon, dentist, [or] pharmacist . . . ."  <u>Id</u>. at § 299A comment b.

Walgreens conceded at oral argument that it has a duty to notify the patient of the need for prior authorization, but maintains that it has no duty to notify the prescribing physician.  Correa submitted undisputed evidence in her motion for summary judgment, however, that Walgreens pharmacists routinely notify patients and prescribers' offices directly of the need for prior authorization, and that, according to her proffered expert, this practice is typical of the industry.[9]

---

[9] Walgreens contends that notifying physicians of the need for prior authorization is not part of its practice, and that it merely requires employees to notify the customer of the need for

Indeed, Schoeck and NENA regularly receive notices of the need for prior authorization from pharmacies, and it is rare for them to receive notice from a patient. Walgreens pharmacists are even trained to provide such notice, and the computer system they use has built-in mechanisms to assist them in doing so.

The skill and knowledge of pharmacists today involve more than the dispensing of pills. A pharmacist exercising the skill and knowledge normally possessed by members of the professional community ordinarily would notify a patient and the prescribing physician that prior authorization is needed.[10]

---

prior authorization and advise the customer to notify his or her physician. In their depositions, Walgreens employees, in turn, characterized their facsimile transmissions and telephone calls to prescribing physicians as a mere "courtesy" to their customers. These characterizations are not dispositive. While a duty may be created by a company's internal policies, a legal duty also may rest on industry practices and policy considerations for an industry as a whole. See Jupin, 447 Mass. at 143, 146-147.

[10] The American Pharmacists Association (APhA) contemplates greater pharmacist involvement in the prior authorization process, in order to help patients overcome what it considers a "barrier[] to patient care." American Pharmacists Association Policy Manual (2017), http://www.pharmacist.com/policy-manual [https://perma.cc/JM8Y-8259] (select "Patient/pharmacist Relationships" and then "Prior Authorization"). Consistent with industry practices, APhA "supports prior authorization programs that allow pharmacists to provide the necessary information to determine appropriate patient care." Id. Indeed, APhA's policy manual asserts that "[p]rescription drug benefit plan sponsors and administrators should actively seek and integrate the input of network pharmacists in the design and operation of prior authorization programs." Id.

iv.  Foreseeability.  "[A]s a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others" (footnote omitted).  Jupin, 447 Mass. at 147, quoting Remy v. MacDonald, 440 Mass. 675, 677 (2004).  "A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor."  Jupin, supra.  "To the extent that a legal standard does exist for determining the existence of a tort duty . . . , it is a test of the 'reasonable foreseeability' of the harm."  Id., quoting McClurg, Armed and Dangerous:  Tort Liability for the Negligent Storage of Firearms, 32 Conn. L. Rev. 1189, 1230 (2000).

If the pharmacist does nothing with the knowledge that prior authorization is needed, the patient will not be able to obtain insurance coverage for the medication.  This could cause foreseeable harm to the patient, who might not otherwise be able to pay for potentially life-saving medications, as was the case here.  See G. L. c. 118E, § 9 (MassHealth covers persons "whose income and resources are insufficient to meet the costs of their medical care").  To prevent this harm, the patient must be made aware that there is a barrier to obtaining the prescription, and that the physician's input is necessary to overcome this barrier.

Notice to the patient, however, is insufficient to discharge the pharmacy's duty.  It is particularly important in these circumstances that the pharmacy also notify the physician directly to avoid foreseeable harm.  Correa submitted undisputed interrogatory responses that, according to her proffered expert, requests that a physician complete a prior authorization form are more effective when they come from pharmacies, as opposed to patients, in part because much of the information needed, and the proper forms and procedures, are known only to pharmacies.  The expert also asserts that the urgency of requests from a patient might be discounted as the patient's unnecessary anxiety or oversensitivity, whereas the pharmacy could be viewed as a more objective source of information.

Given present pharmacy practices, recognition of this limited duty does not place an onerous burden on pharmacies.[11]

---

[11] This duty will not unduly burden smaller, independent pharmacies.  In most instances, those pharmacies, just as national chain pharmacies, likely use computers to run their businesses.  According to amicus curiae National Association of Chain Drug Stores, Inc., ninety-seven per cent of prescriptions filled in Massachusetts are paid for by insurance.  Pharmacies regularly employ specialized computer systems to navigate the numerous health plans available to patients.  See P.D. Fox, AARP Public Policy Institute, Prescription Drug Benefits:  Cost Management Issues for Medicare, at 22 (Aug. 2000), https:// assets.aarp.org/rgcenter/health/2000_09_cost.pdf [https://perma .cc/KZ6R-5DBA].  See also ModernMedicine Network, Health Information Technology in the Community Pharmacy, Drug Topics (Aug. 10, 2016), available at http://drugtopics.modernmedicine .com/drug-topics/news/health-information-technology-community-

Nor does it require pharmacies to monitor or supervise prescribing physicians.  As to the latter, Walgreens argues that Massachusetts common law does not recognize a duty to control a third party's conduct to prevent that person from causing harm to another, absent a "special relationship."[12]  The duty we

---

pharmacy [https://perma.cc/RZ4W-GTC4] ("Software programs that receive prescriptions and aid in dispensing medications are already in wide use in community pharmacies").  To the extent that small pharmacies operate without computers, they may use telephone or facsimile transmissions to notify prescribing physicians that prior authorization is needed.

[12] Walgreens's reliance on the Restatement is unavailing. The Restatement identifies two main types of special relationships that may give rise to legal duties, neither of which is applicable here.  First, the Restatement provides that

> "[t]here is no duty so to control the conduct of a third
> person as to prevent him from causing physical harm to
> another unless (a) a special relation exists between the
> actor and the third person which imposes a duty upon the
> actor to control the third person's conduct, or (b) a
> special relation exists between the actor and the other
> which gives to the other a right to protection."

Restatement (Second) of Torts § 315 (1965).  This has no relevance to the situation here.  Second, "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship."  Restatement (Third) of Torts:  Liability for Physical and Emotional Harm § 40(a) (2012).  These "special relationships" include

> "(1) a common carrier with its passengers, (2) an innkeeper
> with its guests, (3) a business or other possessor of land
> that holds its premises open to the public with those who
> are lawfully on the premises, (4) an employer with its
> employees who, while at work, are:  (a) in imminent danger;
> or (b) injured or ill and thereby rendered helpless, (5) a
> school with its students, (6) a landlord with its tenants,
> and (7) a custodian with those in its custody, if:  (a) the

recognize in this case, however, does not require pharmacies to control the actions of prescribing physicians by, for example, imposing enforcement mechanisms should a physician fail to complete a prior authorization form.  Rather, pharmacies simply must take reasonable steps to notify patients and prescribing physicians that, if the physician wants a patient to receive insurance coverage for the prescribed medication, the physician must complete a form.  Additionally, Walgreens's concern that recognizing a duty here will expose pharmacies to liability every time payment is denied by a health insurer is unfounded.  Our decision only covers situations where insurance coverage is denied specifically because a prior authorization form is required.  Pharmacies can protect themselves from liability in these instances simply by notifying the patient and prescribing physician by any reasonable means, and making a contemporaneous record of having done so.

We decline to hold, as Correa requests, that pharmacies are obliged to follow up with the prescribing physician until they are certain that the physician received and will act upon the request for prior authorization.  A patient may decide at any

---

custodian is required by law to take custody or voluntarily takes custody of the other; and (b) the custodian has a superior ability to protect the other."

Id. at § 40(b).  This provision is also inapplicable.

point to take the prescription to a different pharmacy, so the first pharmacy cannot assume that silence on the part of the prescribing physician means that the physician has not received the notice. To require the pharmacist to make repeated inquiries could also run afoul of the court's holding in Cottam, 436 Mass. at 321-322; a physician may decline to provide the prior authorization form for numerous reasons not known to the pharmacy.

In sum, Walgreens owed a legal duty of care to take reasonable steps to notify both Rivera and her prescribing physician of the need for prior authorization each time Rivera tried to fill her prescription, but its duty extends no further.[13]

c. Accrual of prejudgment interest. General Laws c. 229, § 11, provides that "[i]n any civil action in which a verdict is given or a finding made for pecuniary damages for the death, with or without conscious suffering, of any person, whether or not such person was in the employment of the defendant against

---

[13] Correa argues, in the alternative, that Walgreens voluntarily assumed a duty to notify Schoeck by assuring Rivera and her family that Walgreens's pharmacists would contact him. Voluntary assumption of a duty is a fact-specific inquiry, based on "the totality of the pharmacy's communications with the patient and the patient's reasonable understanding, based on those communications, of what the pharmacy has undertaken to provide." Cottam, 436 Mass. at 326. In light of our holding, we do not consider Correa's alternative argument.

whom the verdict is rendered or finding made, there shall be added by the clerk of the court to the amount of the damages interest thereon."  This court previously has instructed that G. L. c. 229, § 11, must guide decisions with respect to prejudgment interest for wrongful death suits.  Turcotte v. DeWitt, 333 Mass. 389, 392 (1955).  As Correa points out, the statutory language indicates that accrual of interest is mandatory, rather than discretionary.  See G. L. c. 229, § 11 (interest "shall be added"); Retirement Bd. of Stoneham v. Contributory Retirement Appeal Bd., 476 Mass. 130, 138 (2016), quoting Hashimi v. Kalil, 388 Mass. 607, 609 (1983) ("The word 'shall' is ordinarily interpreted as having a mandatory or imperative obligation").

Notwithstanding this language, Schoeck and NENA point to cases from other contexts in which this court has explained that the decision to award or limit prejudgment interest requires "balancing equities."  USM Corp. v. Marson Festener Corp., 392 Mass. 334, 350 (1984).  Such balancing, however, was intended to prevent a plaintiff from obtaining an undeserved windfall.  See, e.g., St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc., 427 Mass. 372, 377 (1998) (prejudgment interest should not run from commencement of action because "the fact that no loss was incurred until after an action was commenced should be recognized, as a matter of fairness, in

order to avoid giving a party an undeserved windfall"); USM Corp., supra at 348 (prejudgment interest not appropriate in trade secret misappropriation action because, unlike typical tort action, "monetary award based on the defendants' profits is not designed to make the plaintiff whole and because . . . the defendants' monetary gain accrued after the commencement of [the] action"). Similarly, an award of prejudgment interest has been denied where the plaintiff unjustifiably delayed the progression of a case. See Peters v. Wallach, 366 Mass. 622, 629 (1975) (delay caused by plaintiffs' repudiation of settlement agreement they had previously accepted); Currier v. Malden Redev. Auth., 16 Mass. App. Ct. 906, 907 (1983) ("a judge has the discretion to adjust an award of interest where a litigant has been responsible for an unnecessary delay"); Whaler Motor Inn, Inc. v. Freedman, 9 Mass. App. Ct. 884, 885 (1980) (delay resulted from "plaintiff's pursuit of [an] untenable position").

Such concerns are not present here. While Schoeck and NENA are not responsible for the delay in this case, Correa's desire to pursue an immediate appeal from the judgment in favor of Walgreens did not afford her a tactical advantage. Indeed, the motion judge decided to stay the claims against Schoeck and NENA in the interests of "judicial economy," realizing that, if Schoeck and NENA proceeded to trial, and Correa then succeeded

in her appeal concerning the claims against Walgreens, the matter would be remanded for trial against Walgreens, resulting in considerable duplication of effort.  If Correa were to prevail against Schoeck and NENA, interest accrued during the appeal simply would compensate her for the loss of the use of the money awarded during the course of the proceedings. See Conway v. Electro Switch Corp., 402 Mass. 385, 390 (1988) (prejudgment interest intended to "compensate a damaged party for the loss of use or the unlawful detention of money" [emphasis added]).  Accordingly, it was error to stay the accrual of prejudgment interest in this case.

3.  Conclusion.  The allowance of Walgreens's motion for summary judgment is reversed, and the stay of the accrual of prejudgment interest is vacated.  The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

LOWY, J. (dissenting).  A systemic flaw contributed to the tragic death of a young woman who was deprived of vital medication because her pharmacy was unable to obtain a prior authorization form from her prescribing physician as required by her insurer.  In an understandable attempt to address this flaw, the court now imposes a nebulous duty on pharmacies to inform physicians that a prior authorization is required for certain medications in order to secure insurance coverage.  This duty requires pharmacies to take "reasonable steps" to notify both the patient and the prescribing physician that a prior authorization is required each time the patient tries to fill the prescription, with no real guidance concerning what constitutes reasonable steps.

I agree with the court that pharmacists have a duty to take reasonable steps to notify patients of the need for prior authorization every time the patient tries to fill a prescription.  I disagree, however, with the court's conclusion that pharmacists have a duty to notify the prescribing physician of the need for prior authorization every time the patient attempts to fill a prescription.  Imposing such a duty is neither implied by contract, mandated by statute, nor -- until today -- recognized by common law.

The court's desire to improve patient safety and avoid the tragic results that occurred in this case is beyond question,

but I am troubled that imposing a tepid duty on pharmacies that have no ability to control the system while simultaneously dissipating the personal responsibility of health insurers, physicians, and patients within the existing system will have an adverse effect on patient safety.

The pharmacy is not the entity that requires the prior authorization, nor does it have the legal authority to provide it. The pharmacy is a conduit because the pharmacy submits insurance claims for coverage. Nonetheless, the court's decision saddles pharmacies with the legal duty to inform physicians' offices that prior authorization is required. The rule announced today dissipates the legal accountability and personal responsibility of health insurers and physicians and gives patients a false sense of security, all while imposing a legal duty on an entity that may not actually be in the best position to help avoid the harms that occurred in this case.[1]

It appears that many pharmacies have attempted to fill this disconnect between the providers prescribing the medications and

---

[1] The prescribing physician also has a duty to provide the prior authorization when doing so is required by the standard of care. The duty imposed by the court may, in certain circumstances, blur that duty. Indeed, Carmen Correa argues that in addition to the negligence of Walgreen Eastern Co., Inc., and Dr. Andreas P. Schoeck, their combined negligence resulted in the prior authorization never being submitted to MassHealth.

the insurance companies requiring the prior authorizations. I expect that this is good business practice and the right thing to do. The court's opinion, however, runs contrary to well-established principles of tort law because it imposes a legal duty on a party without the control or means to avoid the risk and resulting harm. A system that allows health insurers to detach themselves from both the patient and the provider, while fostering a false sense of security among patients, cannot be salvaged by requiring pharmacists to send a single facsimile message or leave a lone telephone message in potentially unmonitored voicemail at a health care provider's office.

Is leaving a voicemail message in the physician's answering service enough? How many telephone calls are enough? Will this duty evolve to require the pharmacy to confirm receipt of the message? Will the pharmacist also have to inform the health insurer that the physician has yet to provide the prior authorization form? What must the pharmacist say to the patient who is without medication and awaiting the prior authorization? Will patients be lulled into a false sense of security and potentially dissuaded from following up with their physician to demand that the prior authorization be completed? Will every pharmacy in the Commonwealth, regardless of the resources available to them, need to create a document retention system to memorialize each attempt to notify a health care provider and to

memorialize the nature of the health care provider's office's response?  Will independent pharmacies be able to create such systems and remain in business?  Will those pharmacies that implement the most thorough process and train their pharmacists to be assiduous and conscientious in seeking to obtain prior authorization expose themselves to enhanced liability when they fail to obtain prior authorization?  Will the court's opinion enable physicians and health insurers to delegate a portion of their responsibilities to pharmacies to the detriment of patients?  I respectfully dissent.