RUBIN, J.
*541 Ildemaro Vieira tragically fell to his death while repairing the siding of a three-story house. The plaintiff, Ana Almeida, as personal representative of his estate,[3] brought this wrongful death and negligence action against the homeowners, Giovanni Pinto and Chelsea Pinhancos Pinto, and Victor Pinto, who was involved in Ildemaro's hiring.[4] A judge of the Superior Court granted summary judgment in favor of the defendants. The plaintiff now appeals.
Background. Summary judgment is proper only if "all material facts have been established and the nonmoving party is entitled to judgment as a matter of law," where all the evidence is "view[ed] ... in the light most favorable to the nonmoving party," here, Almeida. Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120, 571 N.E.2d 357 (1991). In this light, the record reveals the following.
Giovanni and Chelsea purchased a three-unit, three-story house in New Bedford in 2010, which, according to the plaintiff's expert, has a volume of over 35,000 cubic feet, something we must assume is true given the procedural posture of this case. The couple lived in the second-story unit and rented out the other two.
In the fall of 2012, winds from Hurricane Sandy blew off some of the vinyl siding near the second- and third-story windows. Although the summary judgment record contains conflicting evidence on how much siding needed repair, the plaintiff's expert calculated and opined that it was over one hundred square feet, and, since we must take the evidence in the light most favorable to the nonmoving party, *577 we must accept that as well for purposes of decision.
Victor, Giovanni's father, told Giovanni that he should repair the siding because "winter is coming." Giovanni, a commercial fisherman, did not believe he could do the repairs himself, and concluded that "there was a need for a professional person." He asked Victor if he knew anyone who could fix the house. Victor did not, so he asked his landscaper, John Vieira, if he "knew anyone that did vinyl." Initially John responded that he did not *542 know of any such person, but he called Victor back a day or two later and said, "[M]y brother ... does it." John's brother was the decedent, Ildemaro Vieira. According to Almeida, although Ildemaro had occasionally done siding projects, he had never done one higher than the first story of a house on his own and did not have a contractor's or home improvement license. John testified that Ildemaro "did lots of work like [this]." Nobody applied for a building permit.
Victor met with Ildemaro on December 8 to show him the house. Ildemaro offered to do the job for $200, which Victor understood to include the cost of the equipment, as he was never asked to provide any equipment or advance money for expenses. Victor conveyed Ildemaro's offer to Giovanni and asked Giovanni if he wanted Ildemaro to do the work. Giovanni said, "[Y]es." Giovanni testified that he did not know who would be doing the siding, but that he agreed upon a price of $200. Giovanni also testified that he did not know when the work would be performed; Victor testified that he knew only that it would be performed on weekends.
On December 9, Ildemaro met John at a coffee shop and asked to borrow John's ladders for the job. John agreed, and the two of them brought the ladders to the house. John and Ildemaro put one of the ladders against the wall. Ildemaro climbed up, took some measurements, climbed down to cut some of the siding pieces, and climbed up again with two or three pieces of vinyl. He was wearing a tool belt with a screwdriver in it, but no helmet, harness, or other safety equipment. As he was "snapping vinyls together" with the screwdriver, he stretched to his left to finish a piece, and the ladder shifted to the right, causing him to fall. He hit his head first on an iron fence, then on the cement. Two women were walking by, and John yelled at them to call 911, which they did. An ambulance brought Ildemaro to Providence Hospital, where he remained on life support for five days without regaining consciousness.
Discussion. Our review of a grant of summary judgment is de novo. See Federal Nat'l Mtge. Ass'n v. Hendricks, 463 Mass. 635, 637, 977 N.E.2d 552 (2012).
"When reviewing a grant of summary judgment we consider the pleadings, depositions, answers to interrogatories, and responses to requests for admission ... together with the affidavits, and ask if there is any genuine issue as to any material fact.... We view the evidence in the light most *543 favorable to the nonmoving party.... If all material facts have been established and the moving party is entitled to judgment as a matter of law, then the 'judgment sought shall be rendered forthwith.' "
Id., quoting Mass. R. Civ. P. 56(c), as amended, 436 Mass. 1404 (2002). Otherwise, the judgment must be reversed.
The defendants argue that summary judgment was appropriate because the defendants did not owe Ildemaro a duty, and if they did, they did not breach any such duty, or any such breach did not cause Ildemaro's death. See Jupin v. Kask, 447 Mass. 141, 146, 849 N.E.2d 829 (2006) ("To prevail on a negligence claim, a plaintiff must prove that the defendant owed the *578 plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage").[5]
1. Duty and breach. "[T]he existence [or nonexistence] of a duty is a question of law, and is thus an appropriate subject of summary judgment." Jupin, 447 Mass. at 146, 849 N.E.2d 829. Subject to certain exceptions not applicable here, "[a]n owner or possessor of land owes a common-law duty of reasonable care to all persons lawfully on the premises." Dos Santos v. Coleta, 465 Mass. 148, 154, 987 N.E.2d 1187 (2013). Here, although the judge mistakenly concluded otherwise, Giovanni and Chelsea, like other property owners, owed Ildemaro a duty of reasonable care. We will assume, without deciding, that, as their agent, Victor also owed him this duty.
According to the plaintiff, the duty of care was breached in several ways.
"The concept of 'duty' ... 'is not sacrosanct in itself, but is only an expression of the sum total of ... considerations of policy which lead the law to say that the plaintiff is entitled to protection.... No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.' "
Luoni v. Berube, 431 Mass. 729, 735, 729 N.E.2d 1108 (2000), quoting W.L. Prosser & W.P. Keeton, Torts § 53, at 358-359 (5th ed. 1984).
*544 a. Failure to provide safety equipment. The plaintiff argues first that it was the duty of the homeowners to provide safety equipment or the money to purchase it. She provides no support for the contention, however, that homeowners like those in this case may not hire someone who will provide his or her own equipment to undertake home repairs, or that they had a duty in this instance to inquire further whether Ildemaro had adequate equipment, where he offered to undertake specialized work that he claimed to have done before. There is no evidence from which a fact finder could infer that in offering to do the job the decedent gave any indication to the homeowners that he did not already possess or have access to the necessary equipment, that he expected them to provide it, or that he needed help to buy or otherwise obtain it. It is undisputed that John told Victor that Ildemaro "does [vinyl]," which -- in the absence of any indication to the contrary -- implies that he either owned or would obtain the necessary equipment.
b. The low price as breach. The plaintiff argues next that hiring someone to do this job for $200 was itself a breach of the duty of care, because one could not pay for the equipment required to do the job safely at such a rate.
Even assuming there could be a circumstance in which someone might offer to do a job for such a low price that a purchaser should know that it could not be done safely, this is not such a case. The consumer purchasers of the decedent's services here had no specialized knowledge about the cost of siding repair. Homeowners are routinely solicited for the performance of repair and maintenance services. They routinely seek the lowest price, and service providers routinely compete on price. There is no evidence in the record that a person who already owned the equipment *579 necessary to perform the job safely could not have done the job for $200, or that a reasonable homeowner would have known that. Nor, assuming it would alter the analysis, is there any evidence in the record that the price charged for the job was below some market rate that the homeowners should have known, or that the homeowners or their agent knew anything about the circumstances of Ildemaro -- who asked for only $200 -- that might have suggested that he was doing something dangerous out of financial desperation. In short, the homeowners cannot be faulted for accepting the offer to do the repair for the low price sought by the decedent. *545 c. Failure to apply for building permit. The plaintiff next argues that the duty of reasonable care included the defendants' duty to apply for a building permit prior to authorizing the work on their house. See 780 Code Mass. Regs. § 105.1 (2010).[6] A permit is not required for "ordinary repairs," 780 Code Mass. Regs. § 105.2(4), which are defined as "maintenance which does not affect the structure, egress, fire protection systems, fire ratings, energy conservation provisions, plumbing, sanitary, gas, electrical or other utilities." 780 Code Mass. Regs. § 202. However, there was evidence in the record that the city of New Bedford requires permits for repairs like this one if they involve over one hundred square feet of siding. Although we express no view on the correctness of that evidence, viewed in the light most favorable to the plaintiff, the record supports an inference that a building permit was required for the work at issue.
Although regulations do not in and of themselves impose a duty, they are evidence of the standard of care with respect to consequences they were intended to prevent. See Rice v. James Hanrahan & Sons, 20 Mass. App. Ct. 701, 708, 482 N.E.2d 833 (1985) ("in negligence actions evidence of a safety regulation ... [can be introduced to] establish the prescribed standard of care"); Ford v. Boston Hous. Auth., 55 Mass. App. Ct. 623, 625, 773 N.E.2d 471 (2002) ("A violation of [a regulation] is evidence of negligence as to the consequences the ... regulation[ ] [was] intended to prevent"). Among other things, the State Building Code authorizes the building inspector to stop work that is being done in a dangerous manner. See 780 Code Mass. Regs. § 115.1. The regulations in the State Building Code thus evince an intent to protect workers from unsafe working conditions. We therefore will assume without deciding, as the defendants appeared to concede at argument, that, assuming a building permit was required for this work, and assuming it was the homeowners' duty to ensure that one was obtained, the homeowners' duty of care included a duty to obtain such a permit, and that, as they did not even apply for one, there was a breach of that duty.
d. Occupational Safety and Health Administration (OSHA) regulations. Finally, the plaintiff also argues that the defendants violated various OSHA regulations and that this is evidence of their negligence. But the OSHA regulations do not apply to homeowners *546 who hire an independent contractor. See Lynch v. Reed, 284 Mont. 321, 330, 944 P.2d 218 (1997) ("OSHA does not apply to an owner where the worker on the owner's property is an independent contractor and not an employee of the owner"). See also Ellis v. Chase Communications, Inc., 63 F.3d 473, 478 (6th Cir. 1995) ; Cochran v. International Harvester Co., 408 F.Supp. 598, 602 (W.D. Ky. 1975). The judge found that the decedent *580 was an independent contractor, and the plaintiff does not dispute this finding on appeal.[7] Because this means the defendants were not subject to the OSHA regulations, we do not think the regulations support a conclusion that failure to abide by them amounted to breach of the duty of care.
2. Causation. Although, as described, we will assume the plaintiff's evidence with respect to the failure to obtain a building permit was sufficient at least to raise a genuine issue of material fact with respect to duty and breach, her case nonetheless ultimately founders on the shoals of causation. Summary judgment is proper unless from the evidence in the record and all reasonable inferences that can be drawn therefrom in the nonmoving party's favor, a reasonable juror could find the defendants' breach -- in this case, we are assuming, the failure to apply for a building permit -- caused the decedent's injury and death.
According to the plaintiff's expert, it was unsafe to use a ladder to perform the siding repairs, which he opined were at "excessive heights"; only a scaffold or aerial lift would have been appropriate, and we take that as true. The plaintiff argues that, had a permit application been submitted, the decedent never would have undertaken the dangerous work involved in this case on a ladder. She asserts that, "[h]ad a permit application been submitted for this job, a number of safeguards in the process would have been present to prevent the dangerous work from being undertaken." We examine in turn each mechanism by which the plaintiff claims the work would have been stopped:
a. According to the plaintiff's expert, the application would have required the signature of a "registered design professional" (RDP), meaning an architect or engineer, see G. L. c. 143, § 54A ;
*547 780 Code Mass. Regs. § 107.1.1.[8] The plaintiff argues, "First, the registered design professional could have rejected the plans for the project as unsafe." But there is no evidence in the record that, for a project like this, the RDP reviews plans with respect to the manner in which the work is to be performed. On its face, the relevant regulation states that the "site plan" that requires an RDP's signature need only show "the size and location of new construction and existing structures on the site, distances from lot lines, the established street grades and the proposed finished grades and, as applicable, flood hazard zones, high hazard zones, floodways, and base flood elevations" (emphasis omitted). 780 Code Mass. Regs. § 107.2.5. See 780 Code Mass. Regs. §§ 105.3(4), 107.1.1. The assertion that an RDP would have rejected the application on the basis of the manner of the work -- indeed, the question whether an RDP would even review the manner in which the work was to be performed -- is, on this record, speculative.
*581 b. The plaintiff next argues, "Second, the decedent would have had to have been identified in Section IV of the permit application as the person completing the work. He would have had to have left the builder's license number blank in Section IV because he did not possess one. See New Bedford, Mass., Code of Ordinances, § 6-29 (2017). With his lack of training, experience, and licensing, it's reasonable to expect that he would have been rejected as unqualified by the registered design professional or the Building Department."
Although the plaintiff appears to refer to two types of license, a home improvement contractor registration and a construction supervisor license, she does not allege that either license (or any other) was actually required for Ildemaro's performance of the work at issue. Though the questions have not been briefed before us, it appears the decedent did not need a home improvement contractor registration because he worked on one residential contracting undertaking and the aggregate contract price was under *548 $500. See 780 Code Mass. Regs. § 110.R6.1.6(7) (2008).[9] Likewise, it appears the decedent did not need a construction supervisor license because he was not supervising anyone. See 780 Code Mass. Regs. § 110.R5.1.3.1. The plaintiff points to no evidence -- not even in her expert's letter -- that the RDP or the city's building department reviews the qualifications of those who will engage in the work in cases in which no license is required. Nor is there evidence that, even if such review does occur, permit applications are rejected because individuals lack licenses they don't need. That the application would have been rejected due to Ildemaro's lack of qualifications is on this record, again, speculative.
c. The plaintiff argues next, "Third, the defendants would have had to have identified the price of the work as $200 in Section II.C. of the application. This should have served as a red flag due to the unfeasibility of obtaining (a) qualified workers to perform the siding work, and (b) scaffolding or an aerial lift to safely perform the second and third-story work, for such a low price. See New Bedford, Mass., Code of Ordinances, § 6-29 (2017)." But again, there is no evidence in the record before us from which an inference can be drawn that either the RDP or the building department rejects or investigates projects due to low cost listed on the application. Any conclusion that they do would, on this record, also be speculative.
d. Lastly, the plaintiff argues, "In addition, if the defendants made it through the application process and obtained the required permit, they would have been held accountable for ensuring that the siding work was performed in a safe manner. Under Mass. Regs. Code tit. 780, § 115.1 (2017), a building official may order work stopped if it is performed 'in a manner either contrary to the provisions of 780 C[ode] M[ass.] R[egs.] or dangerous or unsafe' " (emphasis omitted).[10] But whether the building inspector would have stopped the work in this case, or come to the worksite before the accident, or, for that matter, at all, is speculative; the plaintiff has offered no evidence to indicate anything about the likelihood of such events.
Conclusion. Liability in negligence "obtains only where the conduct *549 is both a *582 cause in fact of the injury and where the resulting injury is within the scope of the foreseeable risk arising from the negligent conduct." Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 45, 907 N.E.2d 213 (2009). Viewing the evidence in the light most favorable to the plaintiff, there is insufficient evidence in the record to support a jury inference that any negligence of the defendants in failing to apply for a building permit in this case was a cause in fact of Ildemaro's death. Consequently, the judgment must be affirmed.
So ordered.

Almeida and the decedent had lived together for fifteen years, and had two children together.

Because the defendants share a last name, and because the decedent's brother, who shares the decedent's last name, is mentioned in the facts, we shall refer to all these individuals using their first names.

In addition, Victor argues that he cannot be liable because the record establishes that his "only conduct consisted of acting as an agent of the homeowners, Giovanni and Chelsea." Given our disposition of the case, we need not reach the argument.

Unless otherwise indicated, we refer to the 2010 version of the State Building Code, 780 Code Mass. Regs. §§ 100.00, which was operative at all times pertinent to this case.

Although the plaintiff cites cases involving issues concerning a person's employment status, this was only to argue that the defendants retained sufficient control over the decedent to owe him a duty of care, which is a different question from whether the decedent was an independent contractor or an employee to whom OSHA regulations applied.

Viewed in the light most favorable to the plaintiff, none of the exemptions to the RDP requirement apply, because the volume of the house is greater than 35,000 cubic feet. See 780 Code Mass. Regs. § 107.6.1. And there is no indication that the provision allowing the building inspector to grant a waiver of the site plan requirement, see 780 Code Mass. Regs. § 107.2.5, applied in this case. Therefore, for purposes of summary judgment we assume that an RDP's signature would have been a required part of the permit application.

The 2008 version of § 110.R6 of the State Building Code is incorporated by reference into the 2010 version of the Code. See 780 Code Mass. Regs. § 110.R6 (2010).

The 2017 text quoted by the plaintiff is the same as that appearing in the 2010 version of the State Building Code.